**SHANGHAI POWER COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 674–81C.**

United States Claims Court.

Dec. 30, 1983.

---

Richard C. Allison, New York City, with whom were David R. Almond and Reid & Priest, New York City, for plaintiff.

Stephen G. Anderson, Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard and David M. Cohen, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

The President settled plaintiff's claim against the People's Republic of China (PRC) without plaintiff's consent. The question presented is whether plaintiff can state a claim under the just compensation clause of the fifth amendment for the difference between what it received under the terms of the settlement and what it believes the claim was worth.

### Facts

Starting in 1929, plaintiff Shanghai Power Company, a Delaware corporation, owned and operated a power plant in Shanghai, China. A franchise agreement between plaintiff and the Shanghai Municipal Council allowed plaintiff to generate and distribute electricity in the Shanghai area.

In 1950, the People's Republic of China confiscated all property within its borders belonging to U.S. nationals, including plaintiff's power plant. From that time until 1979, when the United States normalized relations with the PRC, plaintiff received no compensation for the loss of its property.

In 1966, Congress authorized the Foreign Claims Settlement Commission (FCSC) to evaluate the claims of U.S. nationals against the PRC. On the basis of the evidence presented by the claimants, the Commission in 1972 determined the value of the property seized by the PRC to have been about $197 million. Plaintiff's share of this amount was almost $54 million. The Commission also found that the claimants were entitled to 6% simple interest from the date of taking; with interest, plaintiff's claim came to more than $144 million.

In 1979, President Carter established diplomatic relations with the PRC. As part of the normalization process, the two nations settled the outstanding claims of U.S. nationals against the PRC. The claims were settled for $80.5 million to be paid to the United States over a period of six years. The United States, in turn, has been paying each of the claimants a pro rata share of the amounts received from the PRC, minus a small administrative fee. Under the terms of the settlement, plaintiff is due to receive approximately $20 million, or $124 million less than under the FCSC formula. Plaintiff is suing to recover that difference from the United States.

Plaintiff argues that President Carter settled its claim against the PRC for a mere fraction of its value in order to achieve broader foreign policy objectives. It cites various White House and State Department pronouncements indicating that normalization of relations with the PRC was considered a highly desirable objective. Plaintiff suggests that the President and the State Department considered the outstanding claims of the U.S. nationals a hindrance to normalization of relations and decided to remove the obstacle by sacrificing those claims. This enabled the President to achieve a public purpose—the normalization of relations with the PRC—at its expense. This, plaintiff argues, is a taking for which it must be compensated. Defendant disagrees. The parties have cross-moved for summary judgment.

### Discussion

■ In order to state a claim for a taking under the fifth amendment's just com-

pensation clause, the plaintiff must establish that it was the owner of property and that such property was taken by the United States for a public purpose. *Public Water Supply District No. 3 v. United States,* 135 F.Supp. 887, 133 Ct.Cl. 348, 352 (1955). Because plaintiff's claim raises novel issues, each component of this test must be examined in turn.

### A. *Did plaintiff have property?*

1. The concept of property for purposes of the fifth amendment has been interpreted broadly and can include "every sort of interest the citizen may possess." *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945) (leaseholds are property). *See also Armstrong v. United States,* 364 U.S. 40, 44, 80 S.Ct. 1563, 1566, 4 L.Ed.2d 1554 (1960) (lien is property); *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (contract rights are property); *In re Air Crash in Bali, Indonesia,* 684 F.2d 1301, 1312 (9th Cir.1982) (claims for compensation are property).

On the other hand, not all interests or expectancies amount to property for purposes of the fifth amendment. As the Supreme Court has noted, only those rights "which have the law back of them" are property. *Kaiser Aetna v. United States,* 444 U.S. 164, 178, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979) (quoting *United States v. Willow River Power Co.,* 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945)). *Cf. Deltona Corp. v. United States,* 657 F.2d 1184, 228 Ct.Cl. 476, 491 (1981) (mere expectancy is not property). For example, no property interest can be acquired in the high water level of a river. *Willow River Power Co.,* 324 U.S. at 511, 65 S.Ct. at 768. Similarly, a private party cannot generally acquire rights in the navigable waters of the United States. *See, e.g., United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 62, 33 S.Ct. 667, 671, 57 L.Ed. 1063 (1913). *See generally* Morreale, *Federal Power in Western Waters: The Navigation Power and the Rule of No Compensation,* 3 Nat. Resources J. 1 (1963). But *see Kaiser Aetna,* 444 U.S. at 178, 100 S.Ct. at 392. A person also acquires no property interest in contraband, *see Ziffrin, Inc. v. Reeves,* 308 U.S. 132, 140, 60

S.Ct. 163, 167, 84 L.Ed. 128 (1939), or by virtue of an expectancy unsupported by a contractual or other obligation. *See United States v. Petty Motor Co.,* 327 U.S. 372, 380 n. 9, 66 S.Ct. 596, 601 n. 9, 90 L.Ed. 72 (1946) (expectation that lease would be renewed is not property); Restatement (Second) of the Foreign Relations Law of the United States § 191 illustration 2 (1965) (beneficiary of will has no property interest during life of testator) [hereinafter cited as Restatement].

■ From these authorities it appears that a plaintiff's interest will be recognized as property for purposes of the fifth amendment unless that interest is devoid of a legally enforceable right or recognition of a property interest would contravene public policy. Under this standard, plaintiff's claim against the PRC amounts to property. The United States has consistently taken the view that foreign governments are entitled to confiscate property belonging to U.S. nationals. *See, e.g.,* Note from U.S. Secretary of State Hull to Mexican Ambassador in Washington (Apr. 3, 1940), *quoted in* 3 G. Hackworth, *Digest of International Law* 662 (1942). However, the United States has also consistently maintained that such a taking must be accompanied by "adequate, effective and prompt compensation." *Id.*[1] *Accord* Restatement §§ 185–190. The right to such compensation for an expropriation is, moreover, a principle recognized in international law, Domke, *Foreign Nationalizations,* 55 Am.J. Int'l L. 585, 603–04 (1961), and one the United States has consistently supported. *See generally* 8 M. Whiteman, *Digest of International Law* 1085–1136 (1967) [hereinafter cited as Whiteman, *Digest* ].

■ Defendant argues that plaintiff's claim is not property because plaintiff could not have raised it against the PRC in American courts under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–1611 (1976), because the expropriation was an act undertaken by the PRC in its sovereign capacity. *See, e.g., International Association of Machinists and Aerospace Workers v. OPEC,* 477 F.Supp. 553, 568–69 (C.D.Cal.1979), *aff'd,* 649 F.2d 1354 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982).

**1.** Indeed, in the view of the United States, the legality of a taking by a foreign government hinges on whether compensation is provided. Hull Note, *quoted in* 3 G. Hackworth at 662; United States Note to Rumania (Sept. 7, 1948),

*reprinted in* 19 U.S. Dep't of State Bull. 408 (1948) (expropriation that does not provide for equitable valuation and prompt, adequate and effective compensation is not recognized).

Plaintiff responds that it could nevertheless have established jurisdiction under the FSIA by virtue of the licensing agreement under which it operated its power plant.[2] It is unnecessary to resolve this dispute because the existence of jurisdiction under the FSIA has no bearing on the threshold question of whether plaintiff has property for purposes of the fifth amendment. *But see* p. 241 & n. 4 *infra.* The FSIA does not affect the substantive law of liability; it merely provides a forum for the presentation of claims established elsewhere. H.R. Rep. No. 1487, at 12, 1976 U.S.Code Cong. & Ad.News 6610. Whether plaintiff has a judicial forum in this country (or elsewhere) to present its claim has no relevance to whether its claim has the law back of it. Even if it were established, as defendant argues, that no suit could be maintained under the FSIA, or indeed in any court in any country, that would not change the fact that international law gives plaintiff an entitlement to full and just compensation, and that our government has consistently endorsed that right.

While in the domestic context it is difficult to conceive of a right without reference to a forum where the right can be enforced, that concept is not foreign to international law. *See generally* 1 M. Whiteman, *Damages in International Law* 275 (1937). Indeed, much of our government's efforts in espousing claims of its citizens has been devoted to establishing fora for such rights, generally in the nature of international commissions or tribunals. *See* M. Hudson, *International Tribunals* 3–14 (1944).

■ Rights created under international law against foreign governments are generally more difficult to vindicate than those created under domestic law between private parties. That does not, however, render international legal rights so illusory as to exclude them altogether from the classification of property. There is no doubt that rights created by virtue of an expropriation are backed by accepted principles of international law. Moreover, recognition of such rights is not contrary to our public policy, but, indeed, is consistent with the repeated expressions of our State Department.[3] The court therefore concludes that plaintiff's claim against the PRC had the law back of it and amounted to property for purposes of the fifth amendment.

2. To hold that plaintiff had property does not, however, establish its value. The court rejects plaintiff's contention that the value was that determined by the Foreign Claims Settlement Commission. The FCSC made its valuation entirely on an ex parte basis, with plaintiff alone producing evidence. *See generally* 8 Whiteman, *Digest* 1146–50. Moreover, the FCSC was valuing an entirely different asset than that allegedly taken here. The Commission's function was to determine the value of plaintiff's plant, i.e., the bricks, mortar, power generators, etc. In 1979, however, at the time of the alleged taking by the United States, plaintiff no longer owned these assets; instead it owned a claim for compensation against the PRC. The value of that claim might have been the same as that of the underlying property but it might have been different. That value would depend upon the likelihood of finding a forum for presenting the claim,[4] overcoming all relevant defenses and obtaining satisfaction from the debtor's available assets. Moreover, the expense of prosecuting such

---

2. Plaintiff suggests that the PRC acquiesced in the validity and continued effect of the agreement, rendering the relationship commercial in nature. *See National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 641–42 (S.D.N.Y.1978), *aff'd*, 597 F.2d 314 (2d Cir.1979) (contractual relationship with government is commercial despite public purpose of transaction). Moreover, the license agreement contained an arbitration clause that, plaintiff argues, implicitly waives sovereign immunity for purposes of the FSIA. *See* 28 U.S.C. § 1605(a)(1) (1976); H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6617 (agreement to arbitrate abroad may constitute implicit waiver of sovereign immunity) [hereinafter cited as H.R.Rep. No. 1487]. The legislative history of the FSIA specifically refers to agreements to arbitrate as implicit waivers of sovereign immunity that would justify assertion of jurisdiction by a U.S. court. H.R.Rep. No. 1487, at 18, 1976 U.S.Code Cong. & Ad.News 6617.

3. It should be noted that not all nations have recognized this principle. *See* n. 15 *infra.* Our government has, however, been among the strongest proponents of the view that the right to full and fair compensation exists and must be respected by other nations. It would be inappropriate for this court to adopt a contrary position.

4. The existence of jurisdiction under the FSIA might well be relevant in determining the value of plaintiff's interest.

a claim and obtaining satisfaction would have to be taken into account. *See also* n. 15 *infra.*

It is impossible to determine the value of plaintiff's property interest without proof on these issues. Consequently, the court cannot decide whether that value is more or less than what plaintiff is receiving from settlement of its claim by the President. For purposes of these motions, the court must therefore assume that plaintiff not only had a property interest but that such interest was worth more than plaintiff is receiving as a result of the settlement of its claim by the President.

B. *Was there a taking?*

1. The Supreme Court has noted that the "Fifth Amendment's guarantee ... [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *accord Deltona Corp.,* 657 F.2d at 1191, 228 Ct.Cl. at 488. The Court has admitted, however, that it "quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The Court has repeatedly admonished that the determination must be made on the basis of "the particular circumstances [of each] case." *Id.* (quoting *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958)); *accord*

*Deltona Corp.,* 657 F.2d at 1191, 228 Ct.Cl. at 488; *see Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983).

■ In determining whether there has been a taking it is important to distinguish in the first instance between those governmental actions that amount to a physical invasion or other appropriation of property[5] and those actions where the government is serving as an arbiter between the conflicting rights and interests of its citizens.[6] *See generally* Sax, *Takings and the Police Power,* 74 Yale L.J. 36, 38–41 (1964). As the Court noted in *Penn Central,* a taking is "more readily ... found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124, 98 S.Ct. at 2659.

■ Even when government is serving as an arbiter between conflicting rights, its action can amount to a taking if it frustrates "distinct investment-backed expectations" of the property owner. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659; *Deltona Corp.,* 657 F.2d at 1191, 228 Ct.Cl. at 487. This somewhat cryptic phrase describes a concept of fundamental justice and fair play, and suggests that even valid regulatory action can result in a taking if government shifts too heavy a burden upon a few individuals, and does so in a sudden and unanticipated manner so that those adversely affected have little opportunity to protect themselves in the marketplace.

■ Factors relevant to whether there has been a taking are the degree to which the property owner's rights were impaired,[7] the extent to which the property owner is

---

**5.** *E.g., United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (overflights directly above plaintiff's land); *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (repeated flooding of land); *King v. United States,* 427 F.2d 767, 192 Ct.Cl. 548 (1970) (intermittent but permanent and substantial flooding of land).

**6.** *E.g., Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (zoning ordinance); *Mosca v. United States,* 417 F.2d 1382, 189 Ct.Cl. 283 (1969) (denial of application for registration of fungicide), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970).

**7.** "[T]he denial of one traditional property right does not always amount to a taking....

an incidental beneficiary of the governmental action,[8] the importance of the public interest to be served,[9] whether the exercise of governmental power can be characterized as novel and unexpected or falling within traditional boundaries,[10] and whether the action substituted any rights or remedies for those that it destroyed.[11] In determining whether a taking has occurred the court must weigh all of the relevant factors and decide whether compensation is required by principles of justice and fair play. *See Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979); *Deltona Corp.,* 657 F.2d at 1191, 228 Ct.Cl. at 488.

> [W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–327, 62 L.Ed.2d 210 (1979). Restrictions on the use of property that have greatly diminished its value have not amounted to takings if significant value was left to the property owner. *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (92.5% diminution in value). *See also Agins v. City of Tiburon,* 447 U.S. 255, 262–63, 100 S.Ct. 2138, 2142–43, 65 L.Ed.2d 106 (1980) (plaintiff who had intended to use land for multiple unit construction limited to five single family dwellings); *Jentgen v. United States,* 657 F.2d 1210, 1212–13, 228 Ct.Cl. 527, 533–34 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982) (plaintiff who sought to develop 80 acres limited to 20 acres).

8. *Agins,* 447 U.S. at 262, 100 S.Ct. at 2142; *Penn Central,* 438 U.S. at 134–35, 98 S.Ct. at 2664–65; *Deltona Corp.,* 657 F.2d at 1190, 228 Ct.Cl. at 489.

9. Courts have permitted the complete destruction or grave impairment of property rights where the governmental interest in question was sufficiently strong. *See, e.g., National Board of Young Men's Christian Associations v. United States,* 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969) (damage to buildings caused by efforts to quell rioting); *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (destruction of cedar trees to prevent infection of apple orchards); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (prohibition against continued operation of brickyard).

10. *See Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 594–95, 55 S.Ct. 854, 865–66, 79 L.Ed. 1593 (1935).

2. The occasion for diplomatic espousal and settlement of a claim arises when one or more of our nationals runs into difficulty collecting a debt from a foreign government.[12] That event may have implications going far beyond the particular debt in question or the parties raising the claim. It is axiomatic that our government cannot guarantee unimpeded commerce with foreign nations, nor even the lives and property of U.S. nationals outside our territory. The degree to which our government is able to assist U.S. nationals abroad depends largely on its ability to maintain amiable relations with other governments.

11. *Penn Central,* 438 U.S. at 137, 98 S.Ct. at 2666; *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 452–53, 57 S.Ct. 298, 301–02, 81 L.Ed. 340 (1937).

12. Espousal is not generally appropriate unless "the American national has exhausted such local remedies as may be open to him and has sustained a denial of justice as that term is understood in international law." Letter from Attorney Adviser Matre, Office of the Assistant to the Legal Adviser for International Claims, to Hershel Davis (May 14, 1956), *quoted in* 8 Whiteman, *Digest* 907. Denial of justice is a complex concept in international law and can be summarized only imperfectly as follows:

> Denial of justice exists where there is a denial, unwarranted delay or obstruction of access to courts, gross deficiency in the administration of judicial or remedial process, failure to provide those guarantees which are generally considered indispensable to the proper administration of justice, or a manifestly unjust judgment. An error of a national court which does not produce manifest injustice is not a denial of justice.

*Responsibility of States for Damage Done to Foreigners,* 23 Am.J. Int'l L., Apr. 1929, at 173 (Special Supp.). *See generally* Restatement § 165 & comment c. Thus, for example, the United States determined that espousal of claims of U.S. citizens against Hungary was warranted in 1950 because "present conditions in Hungary make it impossible in a practical sense for an American citizen to exercise local remedies under Hungarian laws and before Hungarian courts." United States Note to Hungary (Mar. 3, 1950), *reprinted in* 22 U.S. Dep't. of State Bull. 399 (1950). This conclusion was based, inter alia, on the fact that U.S. citizens "cannot freely obtain the services of a Hungarian attorney of [their] choice effectively to assert [their] rights." *Id.*

When a foreign government reneges on a debt to a U.S. national, "a claimant's only hope of obtaining any payment at all might lie in having his government negotiate a diplomatic settlement on his behalf." *Dames & Moore v. Regan*, 453 U.S. 654, 679, 101 S.Ct. 2972, 2986, 69 L.Ed.2d 918 (1981). The President, however, has no obligation to take up a national's claim and present it diplomatically to a foreign government. *See Aris Gloves, Inc. v. United States*, 420 F.2d 1386, 1394–95, 190 Ct.Cl. 367, 380–81 (1970) (quoting 6 *Memoirs of John Quincy Adams* 383 (C. Adams ed. 1874)). The reason for this is made clear by Adams: It is frequently very difficult to obtain justice from foreign nations, even when the claim is a strong one; therefore, a country asserting the claim may have to resort to war to force satisfaction of the claim, and war may inflict greater, uncompensated injury upon many other people. *Id.*

Because a government's refusal to honor debts owed a foreign national is frequently symptomatic of more serious problems between the two countries, governments have traditionally espoused and settled claims without the consent of the nationals holding the claims and "usually without exclusive regard for their interests, as distinguished from those of the nation as a whole." *Dames & Moore*, 453 U.S. at 680, 101 S.Ct. at 2987 (quoting L. Henkin, *Foreign Affairs and the Constitution* 262–63 (1972)); *accord* Restatement § 213; 8 Whiteman, *Digest* 1216–23 & authorities cited. As the Court noted, "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns." 453 U.S. at 679, 101 S.Ct. at 2986 (citing *United States v. Pink*, 315 U.S. 203, 225, 62 S.Ct. 552, 563, 86 L.Ed. 796 (1942)). While individuals may have legitimate claims against foreign nations, and may have recourse to some self-help remedies, the presence of these claims and the claimants' attempts to collect may seriously harm the relations between the two countries. The power of the sovereign to alleviate this point of friction and reestablish amiable relations between the two countries is consistent with "established international practice reflecting traditional international theory." *Dames & Moore*, 453 U.S. at 679, 101 S.Ct. at 2986 (quoting L. Henkin at 262).

■ Our Presidents have exercised the power to settle international claims of U.S. nationals at least since 1799. *Dames & Moore*, 453 U.S. at 679 n. 8, 101 S.Ct. at 2986 n. 8. In the century between 1817 and 1917, for example, there were no fewer than 80 such agreements. *Id.* (citing W. McClure, *International Executive Agreements* 53 (1941) and 14 Whiteman, *Digest* 247).[13] There is no doubt that the President's power to settle international claims and to eliminate these "sources of friction" is an integral aspect of his authority to conduct the foreign relations of the United States. As Chief Judge Learned Hand succinctly noted:

> [t]he continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations.

*Ozanic v. United States*, 188 F.2d 228, 231 (2d Cir.1951).

Every U.S. national who trades in foreign commerce or who travels abroad is a potential beneficiary of the President's authority to settle claims. When tensions arise between our nation and another, those caught in the middle must rely upon the President to safeguard their lives and property to the greatest extent possible. This may mean that others who have claims against the foreign sovereign may be blocked from seeking to collect their debts so that international tensions will not be exacerbated. Yet, in times of emergency, it is frequently entirely fortuitous who will benefit and

---

**13.** For a description of the United States' modern practice in settling international claims see Brief for the United States as *amicus curiae* at 30–32, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *reprinted in* 2 I.L.M. 1009, 1019 (1963).

who will suffer from any such presidential action. The possibility that the President will intervene in this manner is properly recognized as both a shared benefit and a shared risk of those who trade and travel abroad.[14]

The rights of nationals trading or traveling abroad are bound up in another, perhaps more fundamental, aspect of a nation's foreign relations. It is the existence of cordial relations between nations that makes trade possible. Channels of commerce and travel that are free from danger and coercion are as crucial to international trade as to domestic trade. Achieving such safety is, however, much more difficult internationally with multitudinous states and factions claiming sovereignty over sometimes overlapping portions of the globe. Americans who trade or travel abroad rely upon the fabric of relationships established between our government and others as the foundation for all rights and privileges that make their enterprises possible. When that fabric is strained or torn, placing some individual interests in jeopardy, it may not be possible to repair it without sacrificing some pre-existing rights. Yet, if that fabric is not repaired, such rights would be lost in any case.

The circumstances here illustrate this point. For well over 20 years after the

PRC seized its plant, plaintiff did absolutely nothing to obtain compensation. The reason for this was simple and clearly stated by plaintiff's counsel: "There was no opening to China. There was no communication. There was nothing we felt we could do in those years." Transcript of Proceedings, Sept. 29, 1983, at 16. It was only the normalization of relations with the PRC, and the consequential resumption of communication and commerce between the two countries, that held out hope for plaintiff to receive *any* satisfaction of its claim. Yet, settlement of outstanding claims against the PRC was a sine qua non of normalized relations between the two countries. Had the President refused to settle these claims at less than 100 cents on the dollar, there might well have been no normalization and plaintiff would have continued to be without any remedy at all, as it had been for the preceding 29 years.

■ In this light, plaintiff's argument that the President sacrificed its claim to obtain normalization with the PRC could well be stood on its head: Without normalization, plaintiff's claim would have remained unsatisfied as it had been for almost three decades. Rather than an unexpected loss, therefore, the compromise settlement obtained by the President could be characterized as a windfall gain.[15] The

---

**14.** This concept is inherent in the nature of diplomatic espousal: A government's right to assert the claim of its nationals is premised upon the doctrine that injuries to a country's nationals are injuries to the country itself. *See, e.g., Frelinghuysen v. Key,* 110 U.S. 63, 71–72, 3 S.Ct. 462, 466–468, 28 L.Ed. 71 (1884). While this doctrine has been subject to criticism, Jessup, *Responsibility of States for Injuries to Individuals,* 46 Colum.L.Rev. 903, 923–24 (1946), there is much wisdom behind it. An injury to a country's nationals can be an injury to the country itself because it will generally implicate rights and interests of persons other than those directly affected.

**15.** There is serious doubt whether plaintiff had any possibility of securing compensation from the PRC without the intervention of our government. While the principle of just compensation for expropriations is one that our government strongly supports, this view is not necessarily shared by Communist and Third

World countries. The Supreme Court has recognized this point:

> Communist countries, *although they have in fact provided a degree of compensation after diplomatic efforts,* commonly recognize no obligation on the part of the taking country. Certain representatives of the newly independent and underdeveloped countries have questioned whether rules of state responsibility toward aliens can bind nations that have not consented to them and it is argued that the traditionally articulated standards governing expropriation of property reflect "imperialist" interests and are inappropriate to the circumstances of emergent states.

*Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 429–30, 84 S.Ct. 923, 940–41, 11 L.Ed.2d 804 (1964) (emphasis added). For an excellent survey of the divergent views as to the responsibility of states to provide just compensation for nationalizations see Brief for Petitioner at 34–38, 45–51, *Sabbatino, supra, reprinted in* 2 I.L.M. 1149, 1149–50, 1152–53 (1963).

truth no doubt lies somewhere in between: With appropriate regard for the interests of the nation as a whole (including those of plaintiff and the other claimants), the President normalized relations with the PRC. Neither normalization of relations nor satisfaction of plaintiff's claim would have been possible without the other. The President, in the exercise of his constitutional prerogative, struck the bargain he determined would best accommodate all relevant interests. This is a classical adjustment of "the benefits and burdens of economic life to promote the common good." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.[16]

The compromise of plaintiff's claim is not a drastic and unexpected interference with its investment-backed expectations that offends traditional concepts of justice and fair play. As noted earlier, the President's power to espouse and settle claims of our nationals against foreign governments is of ancient origin and constitutes a well established aspect of international law. Plaintiff cannot claim to be surprised by its exercise. Plaintiff did business on foreign soil in an area of the world where the potential for expropriation existed. The possibility that our government would have to intervene to protect American interests in such circumstances was clearly present. Plaintiff had sufficient opportunity to consider these risks in deciding to locate its power plant in Shanghai and the profits it derived during the 17 years of operation should have reflected these considerations.

The concept that the government might step in and discharge debts and otherwise compromise the rights of creditors is hardly novel even in the domestic context. For example, under certain circumstances a

debtor may file for bankruptcy and thereby force an orderly distribution of assets and a discharge of its liabilities. The filing of such a petition has a profound effect upon the rights of creditors. Payments made and liens obtained within a specified time before filing can be set aside or recovered as preferences; the right to pursue self-help remedies is abrogated; debts are discharged with the creditor generally allotted a small fraction of the amount due and sometimes nothing. *See* 11 U.S.C. §§ 547, 362(a)(3), 727, 1141, 1328 (Supp. V 1981).

Bankruptcy proceedings are an attempt by our government to deal with the unpleasant reality that debtors sometimes are unable to meet their obligations. Congress has determined that an orderly liquidation of liabilities serves the interests of commercial stability better than piecemeal dismemberment of a debtor's assets. *Report of the Commission on the Bankruptcy Laws of the U.S.,* H.R.Doc. No. 137, 93d Cong., 1st Sess. 71 (1973), *reprinted in Collier On Bankruptcy,* app. 2, pt. 1, at 71 (1983). Also, there is a strong policy in favor of giving a debtor a second chance so that he will not be oppressed by debts he may never be able to discharge in full. *See Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 290–91, 59 L.Ed. 713 (1915).

 In light of these important policy considerations, a creditor cannot argue that bankruptcy proceedings are unlawful because he could have collected more had he been permitted to pursue other remedies. *See In re 1030 North Dearborn Building Corp.,* 9 F.Supp. 972, 974 (E.D.Ill.1935). Nor will a creditor be allowed to claim a taking because the debt has been dis-

---

**16.** The President's action resulted in both direct and incidental benefits to plaintiff. Directly, the settlement provided plaintiff with some compensation for its claim, thus substituting a smaller certain sum for a larger contingent one. *See Kuehner v. Irving Trust Co.,* 299 U.S. at 453, 57 S.Ct. at 302. Moreover, even if one were to assume that plaintiff could have recovered the full $144 million it claims from the PRC without significant expenditures, the diminution in value to $20 million reduces the claim by only about 85%. In appropriate circum-

stances, diminutions in value in that amount or greater have been held not to amount to a taking. *See* p. 242–43 & nn. 7 & 9 *supra.* In addition, like all other persons in the United States, plaintiff is an incidental beneficiary of normalization because it may now engage in profitable trade with the PRC and take advantage of goods imported from the PRC by others. Plaintiff also shares with other U.S. nationals the benefit of enhanced security that presumably resulted from normalization of relations.

charged even though the debtor may eventually be able to pay off the full amount. The policy of giving debtors a fresh start takes precedence over any hope a creditor may have of satisfying his debt. Of course, when the bankruptcy power is exercised in a wholly novel and unexpected manner, frustrating the legitimate expectations of creditors, it may amount to an unconstitutional taking. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 581–89, 602, 55 S.Ct. 854, 859–63, 869, 79 L.Ed. 1593 (1935); see *United States v. Security Industrial Bank,* 459 U.S. 70, 73–79, 103 S.Ct. 407, 410–12, 74 L.Ed.2d 235 (1982). However, once the rules of the game are established so that creditors are able to factor them into their business decisions, there can be no question of a taking. *See In re Webber,* 674 F.2d 796, 803–04 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 567, 74 L.Ed.2d 931 (1982).

There are, of course, significant differences between the discharge of domestic debts under bankruptcy law and the discharge of international debts by action of the President.[17] Yet, the similarities are striking. Both types of actions respond to the failure of a debtor to meet its obligations. In both situations, the debtor may be relieved of obligations that it could eventually pay; in both cases, self-help remedies that might be advantageous to a particular creditor are abrogated in favor of a common solution that maximizes the overall good. And, in both situations, bona fide claims of individuals may be discharged to promote public objectives.

Moreover, the President's power to espouse and discharge claims against foreign nations is as integral an aspect of foreign commerce as the bankruptcy system is of domestic commerce. Businessmen derive significant benefits from the existence of these powers and their occasional exercise has a stabilizing effect on domestic and foreign trade respectively. In any event, they are part and parcel of the understanding businessmen share about the realities of the marketplace. The President's power to settle international debts has been exercised repeatedly throughout our history. *See* p. 244 *supra.* Those who trade with foreign governments or who hold property in foreign countries must take it into account just as businessmen must consider the existence of our bankruptcy system in structuring their domestic transactions.

3. This case presents considerations in addition to those applicable to more traditional taking cases because it implicates the President's power to conduct the foreign relations of the United States. As the Supreme Court has noted, "[t]hat there are differences between [the power to conduct foreign affairs and domestic affairs] and that these differences are fundamental, may not be doubted." *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 315, 57 S.Ct. 216, 218, 81 L.Ed. 255 (1936). The differences arise from the fact that in foreign affairs "with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *Id.* at 319, 57 S.Ct. at 220. The legislative and judicial branches of government must exercise their powers so as not to interfere with the President's conduct of foreign relations. *See Ex Parte Peru,* 318 U.S. 578, 586–88, 63 S.Ct. 793, 798–99, 87 L.Ed. 1014 (1943); *Mackenzie v. Hare,* 239 U.S. 299, 311, 36 S.Ct. 106, 108, 60 L.Ed. 297 (1915).[18]

---

17. That the bankruptcy system is established by statute is not a material difference because the President's power to espouse and settle claims has the approval of Congress and therefore the force of law. *Dames & Moore,* 453 U.S. at 680–82, 101 S.Ct. at 2987–88.

18. Early in our history the principle was established that constitutional limitations on the President's authority to conduct foreign relations must be policed largely by the President himself lest our security be impaired:

> The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. *For his conduct he is responsible to the Constitution. The committee consider this re-*

Plaintiff's argument that the President sacrificed its claim against a foreign sovereign in order to promote our national interests could be raised by anyone whose claim has been settled at less than 100% of what he thinks it was worth. And in every case there would no doubt be significant evidence pointing to some such ulterior motive. A settlement agreement between two nations, even one that on its face deals with nothing else,[19] does not take place in a vacuum; it is part of the continuing and evolving diplomatic relations between the sovereigns. An amicable resolution of differences may ease overall tensions, facilitating the achievement of other goals. In reviewing the delicate balance sheet of our diplomatic relations, it is always possible to argue that the President might have gained some advantage for the nation by failing to press an individual claim with as much vigor as the claimant might have wished.[20]

A judicial inquiry into whether the President could have extracted a more generous settlement from another country would seriously interfere with his ability to carry on diplomatic relations. As the Supreme Court has recognized, secrecy lies at the very heart of the President's ability to conduct foreign relations. *Curtiss-Wright*, 299 U.S. at 320, 57 S.Ct. at 221. This principle was established by our first President when he refused a congressional request for information pertaining to the negotiations of the Jay Treaty of 1794. In words that are as timely today as when they were first written, President Washington responded as follows:

> The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolitic; for this might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers.

President's Message to the House of Representatives, Mar. 30, 1796, *reprinted in* 1

---

sponsibility the surest pledge for the faithful discharge of his duty. They think the interference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety.* The nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch.
Senate Committee on Foreign Relations, Report, 14th Cong., 1st Sess. (Feb. 15, 1816), *reprinted in* Senate Committee on Foreign Relations, Compilation of Reports, 8 S.Rep. No. 231, 56th Cong., 2d Sess. 24 (1901) (emphasis added).

19. *E.g.*, Agreement on the Settlement of Certain Outstanding Claims and Financial Issues, Jan. 29, 1982, United States-Czechoslovakia, *reprinted in* 21 I.L.M. 371 (1982).

20. A State Department memorandum by a noted Assistant Legal Adviser explains the inherent tension between the interests of individual claimants and those of the United States:

The tendency of individual claimants to press unsound claims—for any loss sustained in a foreign country—and in grossly exaggerated form is well-known. Good faith among States requires that a State in espousing a claim against another State must be permitted to determine and press only claims, or that part of a claim, the soundness of which it is convinced, and to press it in terms of its own estimate of the amount of reparation due or reasonably to be received. . . . *For a State to press unsound claims, either as to substance or as to amount of reparation or damage, against foreign States may well result in jeopardizing sound and reasonable claims of other individual claimants in the same or other categories of claims existing at the same time or in the future.* An espousing State cannot afford to have its good name, its honor, compromised by espousing unsound and perhaps dishonest claims which its nationals or their lawyers may seek to have presented against foreign States.
Whiteman, Comments on Report on "International Responsibility" by Dr. Garcia-Amador 59–61 (Dec. 18, 1956) (unpublished memorandum), *quoted in* 8 Whiteman, *Digest* 1223 (emphasis added). Claimants may well disagree with our government's assessment that their claim is unsound or excessive. Nevertheless, it is the ultimate responsibility of the President, in safeguarding relations with foreign nations, to consider such claims skeptically and press only those that can properly be presented in light of all the circumstances. *See Frelinghuysen v. Key*, 110 U.S. at 75–76, 3 S.Ct. at 469–470.

*Messages & Papers of the Presidents 1789–1897,* at 194–95 (J. Richardson ed. 1897).

 Recognition of a cause of action for a fifth amendment taking on the basis of the President's settlement of a private claim would implicate many of these concerns. Any party dissatisfied with the settlement of its claim by the President would then seek to probe into the thought processes of our negotiators, perhaps even of the President, to establish what they had in mind when they struck the deal. At issue in such a lawsuit would be the entire spectrum of dealings between our country and another to determine whether a concession in the settlement agreement resulted in some collateral benefit to the United States. It is difficult to imagine a less appropriate or more intrusive exercise of judicial power.

Acknowledging this difficulty, plaintiff suggests that the court limit its inquiry entirely to facts disclosed on the public record. This suggestion is entirely unworkable. The public record, particularly concerning diplomatic negotiations, is inherently incomplete and frequently misleading. As Mr. Justice Frankfurter has noted, documents embodying settlements between nations "must be read not as self-contained technical documents, like a marine insurance contract or a bill of lading, but as characteristically delicate and elusive expressions of diplomacy." *United States v. Pink,* 315 U.S. 203, 241, 62 S.Ct. 552, 570, 86 L.Ed. 796 (1942) (Frankfurter, J., concurring). In preparing such settlement agreements, the draftsman "must save sensibilities and avoid the explicitness on which diplomatic negotiations so easily founder." *Id.* The same is true of public statements made by our negotiators and the President in connection with such agreements. These expressions must be calculated "to settle both money claims and to soothe feelings." *Id.* at 242, 62 S.Ct. at 571.

The public record accompanying the settlement thus is not merely evidence of what transpired, it is part and parcel of that process. The settlement document and the public statements surrounding it are calculated to take into account the political realities here and abroad; they may or may not paint a complete or accurate picture of what transpired at the negotiating table.[21] To rely only upon such public statements to divine the intentions and understandings of the parties could lead to an entirely erroneous or distorted conclusion.

 The Supreme Court has noted that not all matters touching upon the foreign relations of the United States are off limits to judicial scrutiny. Rather, each problem must be assessed "in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture of the specific case, and of the possible consequences of judicial action." *Baker v. Carr,* 369 U.S. 186, 211–12, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1962). As the above analysis suggests, each of these factors strongly militates against recognition of the cause of action proposed by plaintiff.

### Conclusion

Plaintiff cannot state a claim for the taking of its property by the United States.[22] Its motion for summary judgment is therefore denied; defendant's motion is granted.

The clerk is directed to dismiss the petition with costs to the prevailing party. 28 U.S.C. § 2412(a) (Supp. V 1981); RUSCC 54(d).

---

**21.** This case illustrates the point. Plaintiff argues that the public record unequivocally and overwhelmingly demonstrates a sacrifice of its claim against the PRC in order to achieve normalization. Defendant disputes this, suggesting that the statements cited by plaintiff can be interpreted quite differently. Plaintiff's Motion for Summary Judgment at 9–10, 22–23; Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment at 36–38.

**22.** Because of the significant factual differences between this case and *E–Systems v. United States,* 2 Cl.Ct. 271 (1983) (MILLER, J.), it is unclear whether the two cases reach inconsistent results. Insofar as the approach taken in *E–Systems* would lead to a different result in this case, I respectfully note my disagreement.