**SHANGHAI POWER COMPANY, Plaintiff,**

v.

**DELAWARE TRUST COMPANY (as Successor Trustee Under the Mortgage and Deed of Trust Dated as of February 1, 1933, by Shanghai Power Company), and Abdoolally, Ebrahim & Co., and All Other Holders of the 6 Tael Preferred Stock of Shanghai Power Company, Defendants.**

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 5, 1986.
Decided: April 15, 1987.

---

R. Franklin Balotti, and William J. Wade,
of Richards, Layton & Finger, Wilmington,
Del., Richard C. Allison, and Peter C.

Williams, of Reid & Priest, New York City, for plaintiff and Donald Mitchell, of Shanghai Power Company, Boise, Idaho, of counsel.

Irving Morris, and Kevin Gross, of Morris and Rosenthal, P.A., Wilmington, Del., and Eric W. Jorgensen, of Brobeck, Phleger & Harrison, San Francisco, Cal., for the Class Representative of the 6 Tael Preferred Stock of Shanghai Power Company.

Richard Greenberg, and David J. Anderson, of the Department of Justice of the United States, and William C. Carpenter, Jr., U.S. Atty. and Richard G. Andrews, Asst. U.S. Atty., for the District of Delaware, for Counterclaim defendant United States.

## OPINION

BERGER, Vice Chancellor.

This is the decision on cross-motions for summary judgment brought by plaintiff, Shanghai Power Company ("Shanghai Power" or the "Company"), and the intervenor, the United States. The motions address Shanghai Power's counterclaim against the People's Republic of China (the "PRC") for amounts allegedly owed as a result of the PRC's expropriation of Shanghai Power's Chinese assets at the time the communists assumed control of mainland China in 1950. In 1979, the United States and the PRC entered into an executive agreement (the "Executive Agreement") that purported to settle all U.S. claims arising out of the 1950 expropriations. The United States maintains that the terms of the Executive Agreement preclude Shanghai Power from obtaining any relief on its counterclaim. Shanghai Power argues that the PRC waived the benefit, if any, of the Executive Agreement and that the counterclaim remains viable. For the reasons set forth below, I find that the Executive Agreement eliminated the "debt" which forms the basis for Shanghai Power's counterclaim and that the PRC did not waive the benefit of the Executive Agreement. Accordingly, the United States' motion must be granted and Shanghai Power's must be denied.

A brief review of the history and facts of this case is useful at this point. The following description is, of necessity, abridged. For more detail, see *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., 316 A.2d 589 (1974), aff'd in part and rev'd in part, *S.A. Judah v. Delaware Trust Co.*, Del.Supr., 378 A.2d 624 (1977); *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., Civil Action No. 3888, Brown, C. (February 23, 1983); and *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., Civil Action No. 3888, Brown, C. (March 9, 1984).

Shortly after coming to power, the PRC expropriated most, if not all, of Shanghai Power's property. Thereafter, the Company ceased to function as a going concern. It seems that its only substantial assets were a claim for the Chinese expropriation and a claim against the Japanese for damages they inflicted on the Company's property between 1937 and 1945. In 1964, Shanghai Power filed a claim under the War Claims Act of 1948, 50 U.S.C.App. § 2001, et seq., for the damages inflicted by the Japanese. In 1967, the Foreign Claims Settlement Commission (the "FCSC") issued Shanghai Power an award of $7,808,208.12 as compensation for those damages. It was the partial payment of that award which prompted Shanghai Power to initiate this litigation.

The Company originally sought a declaratory judgment that two classes of its securities—silver preferred stock (the "preferred") and mortgage debentures (the "debentures")—were without value.[1] Defendants were Delaware Trust Company as successor trustee under Shanghai Power's mortgage and deed of trust dated as of February 1, 1933 and S.A. Judah on behalf of himself and all other holders of preferred (the "Class"). Defendants filed answers denying that the securities were without value. This Court found that both securities were to be paid with reference to

---

1. A finding that these securities were valueless would permit distribution of all the Company's assets to its common stockholder. Far East Power Corporation, which is controlled by Boise Cascade Corporation, owns all of Shanghai Power's common stock.

the Shanghai tael and that since the tael, or its successor currency, had been so drastically devalued, " 'we have no coin in the United States so infinitesimally small' as to pay the obligation." *Shanghai Power* 316 A.2d at 596, *quoting Patak v. West Coast Life Insurance Company*, No. 641,062, L.A.Super.Ct., June 15, 1956 (unreported). It therefore held that both securities were valueless and granted Shanghai Power's motion for summary judgment. The Delaware Supreme Court affirmed this holding with respect to the stamped debentures (approximately 99% of those issued), but it found that disputed factual questions pertaining to the valuation of the preferred and unstamped debentures remained. It therefore reversed the grant of summary judgment as to those securities.

Following remand, the parties reached a settlement of this litigation. The settlement was made possible by the understanding that Shanghai Power would receive some compensation for its expropriation claim against the PRC. In 1966, Congress had authorized the FCSC to evaluate the claims of United States nationals against the PRC. That Commission subsequently valued Shanghai Power's initial loss at approximately $54 million—more than $143 million when interest was added. This, however, was not the amount Shanghai Power was to recoup. Rather, pursuant to the terms of the Executive Agreement, all United States claims against the PRC arising out of the 1950 expropriations were settled for $80.5 million. Shanghai Power's share of this was approximately $20 million.[2]

The settlement required Shanghai Power to contribute approximately $8 million to be distributed on a pro rata basis among the Company's preferred stockholders who filed claims and whose claims were approved.[3] It also provided the mechanism for Shanghai Power's counterclaim. The settlement specifies that all claimants, by filing a claim, submit to the jurisdiction of the Delaware courts. In addition, any claimant is deemed indebted to Shanghai Power if it has an unsatisfied obligation to the Company, including any obligation that the United States purports to have released, waived or compromised. In order to participate in the settlement, any such claimant was required to relinquish the right to rely on that waiver, release or compromise. All parties agree that this aspect of the settlement was expressly designed to prevent the PRC from recovering a portion of the funds it paid under the Executive Agreement by making claims under the settlement.

After providing for various forms of notice to possible claimants, the Court held a hearing on the settlement and approved it in an order which reserved jurisdiction to oversee its implementation, but otherwise dismissed the action. Numerous individuals and entities filed claims with the Special Master appointed to review the validity of such claims. Included among the claimants were approximately thirty-two banks and other businesses located in the PRC (the "PRC claimants"). After those claims were duly certified, Shanghai Power filed a counterclaim against the PRC claimants pursuant to the terms of the settlement. Shanghai Power also sent them interrogatories designed to determine whether or not they were agents or instrumentalities of the PRC. With one exception, no responses were forthcoming. Shanghai Power withdrew its counterclaim as to the one responding claimant, apparently having decided that the claimant was not an instrumentality of the PRC. The Company then

**2.** Shanghai Power subsequently sued the United States alleging that the President's settlement of its expropriation claim without its consent and for less than the FCSC valuation constituted a taking under the fifth amendment. The court disagreed in an involved analysis of the nature of claims against foreign sovereigns and the particular circumstances of Shanghai Power's claim, and it granted summary judgment for the United States. *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237 (1983), *aff'd mem.*, 765 F.2d 159 (Fed.Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).

**3.** The settlement also included a provision for the unstamped debenture holders. This and other references to the debentures will not be discussed, however, as they are not germane to the pending motions.

moved for a default judgment against the remaining PRC claimants.

Because of the international implications of the Shanghai Power counterclaim, this Court invited the participation of the United States Department of State. The United States responded by filing a memorandum opposing Shanghai Power's default judgment motion. It grounded its opposition on the argument that the Executive Agreement between the United States and the PRC irrevocably extinguished all claims Shanghai Power may have had as a result of the 1950 expropriation and that Shanghai Power was powerless to revive those claims.

This Court granted Shanghai Power's motion without reaching the substantive issues relating to the Executive Agreement. The Court decided the motion on procedural grounds. It noted that the PRC claimants neither opposed the terms of the settlement (which included the counterclaim provision) nor responded to the counterclaim or interrogatories. The Court indicated that the belated argument made by the United States on behalf of the PRC claimants might have succeeded as an affirmative defense to the counterclaim had the PRC claimants appeared and raised it. However, since the PRC claimants failed to do so, the Court found that entry of a default judgment was appropriate.

Shortly thereafter, the PRC sent a protest to the United States government asserting that the default judgment constituted a breach of the Executive Agreement.[4] This prompted the United States to move to intervene. It claimed that, by virtue of the Executive Agreement, it had an interest in the counterclaim and that the disposition of the counterclaim would impair its ability to protect that interest unless allowed to intervene. Intervention was granted on the basis of the United States' interest, the international implications of this case and the intervening decision in *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237.[5] The United States and Shanghai Power then filed cross-motions for summary judgment as to the counterclaim.

With this background, I now turn to an analysis of the pending motions. The Executive Agreement between the United States and the PRC is critical to this dispute. It was executed during the process of normalizing relations between the two nations and was intended to remove what had been a substantial obstacle to normalization—the absence of compensation for the 1950 expropriations. *Id.* at 245–246. The Executive Agreement provides, in relevant part:

## ARTICLE I

The Claims settled pursuant to this Agreement are:

(a) the claims of the USA and its nationals (including natural and juridical persons) against the PRC arising from any nationalization, expropriation, intervention, and other taking of, or special measures directed against, property of nationals of the USA on or after October 1, 1949 and prior to the date of this Agreement; and

(b) the claims of the PRC, its nationals, and natural and juridical persons subject to its jurisdiction or control against the USA arising from actions related to the blocking of assets by the Government of the USA on or after De-

4. The Chinese protest stated, in part:
   According to the May 11, 1979 Sino-American Agreement ..., the questions between the United States and China regarding assets have been completely and finally resolved.... The American court's decision to stop payments to recognized Chinese shareholders is completely devoid of logic, and runs counter to the above-mentioned governmental agreement.... If the U.S. Government refers to the independence of the judiciary as an excuse ... and refuses to carry out the bilateral

governmental agreement for settling claims, the Chinese side will have no choice but to take measures deemed necessary....
Note from the PRC to U.S. Dept. of State (April 4, 1983) appended to United States' Memorandum of April 13, 1983 as Exhibit C.

5. The Court found this decision significant because it indicated—contrary to Shanghai Power's position—that it was within the President's power to settle the Company's claim against the PRC.

cember 17, 1950 and prior to the date of this Agreement.

## ARTICLE II

(a) The Government of the USA and the Government of the PRC agree to a settlement of all claims specified in Article I. The Government of the PRC agrees to pay to the Government of the USA the sum of $80.5 million as the full and final settlement of the claims specified in Article I. The Government of the USA agrees to accept this sum in full and final settlement of those claims.

\* \* \* \* \* \*

## ARTICLE IV

The Government of the USA shall be exclusively responsible for the distribution of all proceeds received by it under this Agreement.

## ARTICLE V

After the date of signature of this Agreement, neither government will present to the other, on its behalf or on behalf of another, any claim encompassed by this Agreement. If any such claim is presented directly by a national of one country to the government of the other, that government will refer it to the government of the national who presented the claim.

Agreement Between the Government of the United States of America and the Government of the People's Republic of China Concerning the Settlement of Claims, May 11, 1979, 30 U.S.T.1957, 1958–1960, T.I.A.S. No. 9306 (the "Executive Agreement").

There is no longer any question but that the President had the power to make this agreement and that it applies to Shanghai Power's claim against the PRC. *See Shanghai Power Co. v. United States*, 4 Cl.Ct. at 239 ("The President settled plaintiff's claim against the People's Republic of China...."); *Shanghai Power, supra,* slip op. at 4 (March 9, 1984) ("There can be no doubt that the claim of Shanghai Power against the PRC ... fell within the scope of the claims purportedly settled by the

Executive Agreement."); *see Dames & Moore v. Regan,* 453 U.S. 654, 679, 101 S.Ct. 2972, 2986, 69 L.Ed.2d 918 (1981) ("Since 1952, the President has entered into at least 10 binding settlements with foreign nations, including an $80 million settlement with the People's Republic of China."). Moreover, by its terms, the Executive Agreement constitutes a "full and final settlement" of all claims by United States nationals arising from the expropriations, including Shanghai Power's claim.

The United States begins with the proposition that the Executive Agreement is now part of the fabric of federal law and, as such, is the supreme law of the land. *See United States v. Pink,* 315 U.S. 203, 230–231, 62 S.Ct. 552, 565–566, 86 L.Ed. 796 (1942). ("A treaty is a 'Law of the Land'.... [I]nternational compacts and agreements ... have a similar dignity."). The Executive Agreement thus unequivocally binds both this Court and Shanghai Power. Neither may oppose it; neither may modify it. *See id.* at 230–231, 62 S.Ct. at 565–566 ("[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement."); *United States v. Belmont,* 301 U.S. 324, 332, 57 S.Ct. 758, 761, 81 L.Ed. 1134 (1937). The Executive Agreement, as an expression of federal law, has fully and finally settled Shanghai Power's expropriation claim.

As a result of that settlement, the United States continues, Shanghai Power may not sue the PRC on its claim either directly or by counterclaim. Federal law has eliminated the PRC's debt and with it any legal basis for a claim by Shanghai Power. As to Shanghai Power's contention that the debt has been revived by the settlement agreement, the United States argues that any such revival would, at the very least, constitute an impermissible amendment to the terms of the Executive Agreement. *See Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1523 (D.C. Cir.1984) ("Final settlement between the sovereigns 'wipe[s] out the underlying private debt,' [citation omitted] and releases the defendant sovereign from all obli-

gations except such as the settlement agreement may provide."), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985). Therefore, the United States concludes, if any provisions of the settlement agreement purport to establish a counterclaim against the PRC, they are in conflict with federal law and void.

Shanghai Power responds that the terms of the Executive Agreement may be waived by their intended beneficiaries and that the PRC claimants have waived the protection of the Executive Agreement by filing claims. Shanghai Power points out that an executive agreement has the same validity as a treaty or congressional statute and that beneficiaries under such instruments may waive their rights. *See United States v. New York & Porto Rico Steamship Co.,* 239 U.S. 88, 93, 36 S.Ct. 41, 42, 60 L.Ed. 161 (1915); *United States v. Green,* 671 F.2d 46, 49–51 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). Shanghai Power argues that it has done nothing to modify the PRC's rights under the Executive Agreement. Any modification was accomplished by action of the PRC in filing its claims.

The terms of the settlement agreement upon which Shanghai Power relies provide, in relevant part:

> In the event that a claim shall be submitted by or on behalf of any person who shall himself be, or whose predecessor(s) in interest or any of them are indebted (as hereinafter defined) to SPC or against whom SPC may have a claim (as hereinafter defined) of any nature, no payment shall be made to or for the account of any such claimant from the unstamped Debenture Fund or the Stock Fund unless and until SPC's rights against him or his predecessor(s) in interest, as the case may be, shall have been discharged by payment in full to SPC.
>
> \*   \*   \*   \*   \*   \*

> A person shall be deemed to be indebted to SPC, and SPC shall be deemed to have a claim against such person, in any and all cases where, in law or in equity, such person shall have any obligation of any nature (whether based upon contract, tort or the violation of any legal right or norm recognized in American jurisprudence) to SPC that is unsatisfied in whole or in part, including, without limitation, any obligation that has been or purports to have been released, waived or compromised by any third person (including, without limitation, the Government of the United States of America or any instrumentality thereof) on behalf of, for the account of, or otherwise in any manner binding or purporting to be binding upon, SPC. Any person deemed to be indebted to SPC as defined in this subparagraph F(ii) shall, as a condition to participation in the settlement, relinquish any right to rely upon any purported waiver, release or compromise made on behalf of, for the account of, or alleged to be binding upon SPC, and shall waive any defense of statute of limitations, laches or any other defense based on the passage of time.

Settlement Agreement at ¶ 4F(i) and (ii). Shanghai Power argues that this language is unambiguous and establishes that the PRC waived the benefits of the Executive Agreement at least to the extent of the Company's $1.5 million counterclaim.[6]

▪ Having considered the parties' positions and the relevant authorities, I am convinced that the United States must prevail. The Executive Agreement declares that Shanghai Power's claim against the PRC has been fully and finally settled. If Shanghai Power's claim has been settled, the PRC's debt has been extinguished. Shanghai Power cannot now use that debt as the legal foundation for either a claim or counterclaim. Even if it were assumed that Shanghai Power had managed to cir-

---

**6.** Shanghai Power has not argued that this Court's approval of the settlement in any way validates the Company's counterclaim. Indeed, the settlement agreement expressly provides that enforceability of a claim by Shanghai Power based on any alleged indebtedness shall not be a condition to the approval of the settlement by the Court nor shall it be a condition to the effectiveness or performance of the settlement agreement by any party thereto. Settlement Agreement at ¶ 4F(ii).

cumvent the strict terms of the Executive Agreement, the Company could not prevail. The policy behind the Executive Agreement would prevent it.

■ As the Supreme Court has observed, "outstanding claims by nationals of one country against the government of another country are are 'sources of friction' between the two sovereigns." *Dames & Moore v. Regan*, 453 U.S. at 679, 101 S.Ct. at 2986, *quoting United States v. Pink*, 315 U.S. at 225, 62 S.Ct. at 563. The policy underlying the settlement of American claims against the PRC was to remove these very real sources of friction. Indeed, the Court of Claims noted that "settlement of outstanding claims against the PRC was a *sine qua non* of normalized relations between the two countries." *Shanghai Power Co. v. United States*, 4 Cl.Ct. at 245. Enforcement of Shanghai Power's counterclaim would revive a source of friction carefully laid to rest and, thus, would undermine the policy behind the Executive Agreement. It cannot be disputed that Shanghai Power structured the settlement in such a way as to attempt "to get around the terms of the Executive Agreement...." *Shanghai Power Co., supra*, slip op. at 2 (March 9, 1984). Inasmuch as this Court cannot enforce a state law that impairs the policy behind an executive agreement, *United States v. Pink*, 315 U.S. at 230–231, 62 S.Ct. at 565–566, *a fortiori*, it cannot enforce a private settlement having the same effect.[7] *See also* 15A C.J.S. *Compromise & Settlement* § 38 (a contract of compromise is unenforceable where it is in contravention of statute or the policy thereof).

■ I am not persuaded by Shanghai Power's argument that it is the PRC which has restored its own obligation. Shanghai Power arrives at this conclusion through the purported waiver contained in the settlement. The Company contends that the PRC, through the PRC claimants, voluntarily waived its rights under the Executive

Agreement in order to participate in the settlement fund. As I see it, however, the issue with respect to the settlement agreement is not so much whether the PRC claimants may waive their rights under the Executive Agreement as it is whether Shanghai Power could properly condition their participation in the settlement fund upon such a waiver.

The settlement agreement includes various provisions designed to ensure that only bona fide owners of the relevant securities share in the settlement fund. Specifically, claimants are required to submit a claim form together with supporting documentation, and a Special Master was appointed to determine, from all the available evidence, whether the claimant established his ownership of the securities. *See* Settlement Agreement at ¶ 4. These conditions apply to all claimants and provide a practical and objective basis on which to determine their entitlement to participate in the settlement fund.

The "waiver" condition, by contrast, has no bearing on a claimant's ownership of the securities. As a practical matter, the waiver condition applies only to the PRC claimants. It purports to require that they relinquish their rights under the Executive Agreement in order to assert their rights as security holders. Yet there is no legally cognizable relationship between these two rights. The waiver condition is but another expression of Shanghai Power's dissatisfaction with the terms of the Executive Agreement. Shanghai Power has no more authority to condition participation in the settlement fund upon a waiver of the Executive Agreement than it does to alter the terms of the Executive Agreement directly.

■ The result would be the same if one were to analyze the validity of the waiver rather than Shanghai Power's authority to impose a waiver condition. A waiver is the intentional relinquishment of a known right, *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461

---

**7.** I note that the United States has agreed that the international consequences of the default judgment are not pertinent to the resolution of the pending motions. (United States' letter to

the Court dated March 10, 1986). This does not mean, however, that this Court can ignore the *Pink* mandate to preserve the policy behind the Executive Agreement.

(1938), and must be voluntary. 28 Am. Jur.2d *Estoppel and Waiver* § 154. The PRC's reaction to this Court's initial default judgment, as evidenced by the diplomatic correspondence cited above, belies any argument that either the PRC or the PRC claimants voluntarily gave up their rights under the Executive Agreement. *Cf. Boyd v. Adams*, 513 F.2d 83 (7th Cir. 1975).

■ Before concluding, several other arguments raised by the parties need to be addressed, albeit briefly. Shanghai Power argues that it gave up its right to a trial when it agreed to the settlement. It contends that the waiver provision is a critical element of the settlement and to eliminate it would be to eliminate a portion of its consideration. The Company suggests that this Court should not lightly undertake to modify the terms negotiated by the parties.

It is not clear that this decision does, in fact, modify the terms of the settlement agreement. As noted above, the settlement agreement explicitly requires Shanghai Power to perform irrespective of the fate of its counterclaim. Since there has been no previous adjudication of the validity of the waiver condition, Shanghai Power must have recognized the risk that its counterclaim would be denied at the time it entered into the settlement agreement.

■ In addition, the Class suggests that the PRC is indirectly attempting to circumvent its obligations under the Executive Agreement. The United States interprets the Executive Agreement as allowing the PRC claimants to participate in the settlement fund even if that means they will recover a portion of the $80.5 million expropriation payment. This interpretation is entitled to great weight, *see Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961), and, in any event, I find it more persuasive. The Executive Agreement describes the rights the PRC gave up and that description does not include its rights, or those of any of its

entities, as a stockholder in an American company.

■ Finally, in a related point, both Shanghai Power and the Class argue that it is inequitable for the PRC claimants to be allowed to participate in the fund. This complaint is bottomed on the perceived inadequacy of the terms of the Executive Agreement. As has been discussed above, however, it was within the power of the President to negotiate those terms. This Court cannot question them, *see Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 812 n. 19 (1st Cir.1981), and it cannot allow Shanghai Power to collaterally attack them.

For the reasons set forth above, the United States' motion will be granted and Shanghai Power's denied.[8]

---

**8.** Having concluded that Shanghai Power cannot recover on its counterclaim, I need not reach the dispute between the Company and the

Class as to how a potential recovery would have been distributed.