In the Matter of

INTERNATIONAL RE-INSURANCE CORPORATION, a Delaware corporation in Receivership in the Court of Chancery of the State of Delaware, in and for New Castle County.

APPEAL OF THE INSURANCE COMMISSIONER OF THE COMMON-WEALTH OF PENNSYLVANIA, AS STATUTORY LIQUIDATOR OF KEYSTONE INDEMNITY EXCHANGE, DISSOLVED, FROM A DECREE ENTERED ON THE 9TH DAY OF APRIL, 1951, BY THE CHANCELLOR OF THE STATE OF DELAWARE, IN THE RECEIVERSHIP PROCEEDINGS OF INTERNATIONAL RE-IN-SURANCE CORPORATION DISALLOWING AMENDED CLAIM No. 22688.

*Supreme Court, On Appeal, February 26, 1952.*

SOUTHERLAND, C. J., and TUNNELL, Justice, and LAYTON, Judge, sitting.

*C. Edward Duffy*, for appellant.

*Arthur G. Logan*, of Logan, Marvel & Boggs, for receivers of International Re-Insurance Corporation, appellees.

SOUTHERLAND, Chief Justice, delivering the opinion of the court:

The Insurance Commissioner of Pennsylvania, as Statutory Liquidator of the business and affairs of Keystone Indemnity Exchange, a reciprocal insurance exchange under the laws of Pennsylvania, filed in the receivership of International Re-Insurance Corporation in the court below a creditor's claim based upon a contract dated August 15, 1930, insuring the subscribers of the Exchange, in an amount not exceeding $1,000,000, against loss by reason of liability for assessment for which they were liable as policy-

holders of the Exchange. The special master appointed by the Chancellor to hear claims recommended disallowance on three separate grounds. The Chancellor agreed with the special master, and by order dated April 9, 1951, *ante p.* 28, 78 A2d 744, disallowed the claim on the same grounds. This appeal followed.

The facts are as follows:

■ Keystone Indemnity Exchange (hereinafter called "the Exchange") was organized in Pennsylvania in 1919 under the insurance laws of that State applicable to reciprocal and inter-insurance exchanges. *Art. X, Secs.* 1001-1011, 40 *P. S.* §§ 961-971. Such an exchange is an unincorporated group of subscribers who exchange insurance contracts with each other providing indemnity among themselves from loss. The group operates through a common attorney-in-fact, to whom is given by each subscriber a power of attorney under which he represents each subscriber individually in exchanging insurance with the others. *Long v. Sakleson,* 328 *Pa.* 261, 195 *A.* 416.

Keystone was organized in 1919 and was duly authorized to transact business. Its attorney-in-fact was Keystone Indemnity Company. For some years the policies issued by the attorney-in-fact imposed upon the policyholder (the "subscriber") no liability for the debts of the Exchange beyond the premium paid for protection. The Act of April 9, 1929, amended the Pennsylvania insurance laws to require that powers of attorney under which reciprocal insurance is to be effected or exchanged "shall provide that the liability of the subscribers, exchanging contracts of indemnity, shall make provision for contingent liability, equal to not less than one additional annual premium or deposit charged." *Insurance Laws, State of Pennsylvania, Sec.* 1004(c), *Act of April* 9, 1929, *P.L.*, 464, 40 *P.S.,* § 964(d). Some time after the passage of the amendatory act of 1929, the Exchange inserted the following provisions in its policies:

"N. In the event that the premium herein provided for, together with the premium deposits of other subscribers, and the reserves and surplus funds maintained by Keystone Indemnity Exchange shall be insufficient to pay the losses incurred, Assured shall be contingently liable for an additional amount, not to exceed, however, the annual premium or deposit charged herein. It is understood and agreed, however, by and between the subscriber and Keystone Indemnity Company, Attorney-in-Fact, that the said Keystone Indemnity Company shall procure adequate insurance and reinsurance in Companies of acceptable standing providing indemnity against any such contingent premium liability on the part of the Assured as herein provided."

Thereafter a contract dated August 15, 1930, was executed between the Exchange, acting through the attorney-in-fact, and International Re-Insurance Corporation, a California corporation. By endorsement dated June 9, 1931, the obligations of International under this agreement were assumed by its successor, International Re-Insurance Corporation, a Delaware corporation.

The following are pertinent excerpts from the contract:

"Memorandum of Agreement
between the Keystone Indemnity Exchange of the City of Philadelphia, Pennsylvania, acting through its Attorney-in-Fact, the Keystone Indemnity Company, also of Philadelphia, Pennsylvania, hereinafter called Keystone, of the first part and the International Reinsurance Corporation of Los Angeles, California, a corporation, hereinafter called International, of the second part.

"In consideration of the payment of the premium as hereinafter provided and of their respective agreements as herein set forth, the parties hereto do hereby agree as follows:

"1. International will indemnify the subscribers of the Exchange against loss by reason of liability for assessment for which they are liable as policy holders of Keystone, under their signed Agreement and Power of Attorney in addition to their annual earned premium, up to an amount not exceeding One Million Dollars ($1,000,000).

"The liability of International shall be limited to any assessment which may be levied, in addition to the annual earned premium, but not exceeding One Million Dollars ($1,000,000.00).

"2. In no event shall liability attach to International unless and

until the Exchange has paid losses which together with required reserves shall exceed one hundred per cent (100%) of the gross earned premium income during the twelve (12) months period ending on the day immediately prior to the declared date of assessment. For all purposes of this Agreement, the term 'gross earned premium income' shall be understood to mean the pro rata proportion of every policy holder's premium applicable to that policy period (in respect of every such policy holder) which is in force during such period, with allowance of an amount not exceeding twenty-five per cent (25%) for management expense.

\*     \*     \*     \*     \*     \*

"4. The premium rate for this contract shall be one half of one per cent (½ of 1%) of the gross original premium income of Keystone during the year reinsured; said gross original premium income shall consist of all original advance or deposit premiums, less cancellation and return premiums, but shall not be reduced by an amount paid for this or other reinsurance, or by dividends declared, paid or credited to subscribers.

\*     \*     \*     \*     \*     \*

"12. This Agreement may be cancelled at any time at the request of Keystone or International by giving three (3) months' notice of such cancellation. If this Agreement shall be cancelled as hereinabove provided, or become void or cease, the premiums having been actually paid to International, the unearned portion shall be returned to Keystone, the earned premium retained by International in the event of the policy being cancelled by it being computed at the rate of one half of one per cent (½ of 1%) of the gross original premium income of Keystone as specified in paragraph four (4) above during the time the Agreement has been in force or at the customary short rate of the annual minimum deposit premium within mentioned, whichever is the greater.

"13. This Agreement shall take effect at and from 12:01 A. M. August 15th, 1930, and shall remain in force and effect until 12:01 A. M. August 15th, 1931, unless previously cancelled by either party as provided in paragraph 12."

By endorsement dated December 2, 1931, paragraph 13 was amended to read as follows:

"13. This Agreement shall take effect at and from 12:01 A. M. Eastern Standard Time, August 15th, 1930, and shall remain in full force and effect until cancelled by either party, as provided in paragraph numbered 12, of said Agreement."

On July 1, 1932, International canceled the agreement, effective October 1, 1932.

In April, 1933, the Chancellor appointed receivers for International on the ground of insolvency.

On May 18, 1933, the Court of Common Pleas of Dauphin County, Pennsylvania, finding the Exchange to be insolvent, directed the Insurance Commissioner of Pennsylvania to take possession of its property and liquidate its business and affairs.

On September 12, 1938, the Court of Common Pleas of Dauphin County ordered that the subscribers of the Exchange holding policy contracts exchanged among said subscribers and issued from April 9, 1929, to May 18, 1933, should pay an amount equal to one annual deposit premium on each policy issued to them for the purpose of paying losses of the Exchange unpaid at the date of dissolution and other legal obligations and expenses. The assessment aggregated nearly $3,000,000.

On December 30, 1941, the Insurance Commissioner of Pennsylvania, as Statutory Liquidator of the Exchange, filed a claim in the receivership of International in the amount of $1,000,000 "for indemnity for subscribers of said Exchange against assessment that has been levied to pay outstanding losses." An amended claim was filed on August 1, 1949, which, like the original claim, is founded upon the assessment liability of the subscribers, it being asserted in the amended claim that the liability of those subscribers whose policies were exchanged during the period from August 15, 1930, to October 1, 1932 (the duration of International's contract), will not be less than $1,000,000. Both claims are alleged to be filed "on behalf of subscribers of said Keystone Indemnity Exchange."

In addition to some formal objections, the receivers excepted to the claims on the ground that nothing was due under the contract of August 15, 1930. As before stated, the special master sustained the receivers' exceptions on three

grounds. On exceptions to the special master's report the Chancellor upheld the special master's findings.

First, the Chancellor held that the contract of International ran to the subscribers individually; that it was not an asset of the Exchange; that the Liquidator took no rights therefrom as Liquidator; and that, having failed to adduce any evidence of authority to represent the subscribers in enforcing their individual rights to indemnity against International, he had no standing to press the claim.

Second, he held that assessment was a prerequisite to any liability of International; and that since no assessment was made until 1938, a date long after the agreement had been terminated by cancellation, no loss for which International was liable had occurred within the life of the agreement.

Third, he held that the failure to file a definite claim for loss within the period of two years following the termination of the agreement barred any recovery on the claim.

From the judgment embodying these conclusions the Liquidator has appealed.

Passing over the first of the three grounds on which the Chancellor based his decision, we take up the second, which concerns the effect of the cancellation by International of the agreement of August 15, 1930.

It is elementary that an insurance contract may properly include provisions for its cancellation, and that an insurer who reserves that right may exercise it by complying with the conditions of the contract. 29 *Am.Jur. sec.* 275; *Couch, Cyc. Ins.Law, sec.* 1406; *Pacific Mut.Life Ins. Co. v. Strange,* 226 *Ala.* 98, 145 *So.* 425; *Camp v. Ætna Ins. Co.,* 170 *Ga.* 46, 152 *S.E.* 41, 68 *A.L.R.* 1166. Indeed, it appears to be admitted in the claim itself that International effectively canceled its agreement as of October 1, 1932. The question at once arises whether any loss insured against occurred while

the contract was in force; if not, the claimant cannot recover.

What was the nature of the risk assumed by International? The parties are in sharp disagreement as to the proper construction of the contract in suit, that is, whether it is one of liability (appellant's contention) or one of strict indemnity only (the receivers' contention). For our present inquiry we think the distinction immaterial. We shall assume, without deciding, the correctness of a construction favorable to appellant, i. e., that the risk insured was the risk of liability to assessment and not the risk of actual loss to the individual subscribers resulting from payment or the recovery of a judgment. The question nevertheless recurs: Did any loss occur while the contract was in force?

From the moment when the Pennsylvania Act of April 9, 1929, became effective, the subscribers of the Exchange became liable to assessment. That liability, however, was only contingent. It could become an actual liability only after the assessment had been made. The impaired financial condition of the Exchange did not create the actual liability; that could flow only from the making of the assessment itself. It appears to be the settled law of Pennsylvania that in an action to recover an assessment against a member of a mutual fire insurance company the statute of limitations runs from the time of the actual making of the assessment, and not from the date of the occurrence of losses which eventually make an assessment necessary, nor even from the date when insolvency is actually established. *Eichman v. Hersker*, 170 *Pa.* 402, 33 *A.* 229; *Schofield v. Turner*, 213 *Pa.* 548, 62 *A.* 1068. The same rule appears to be applicable to assessments of subscribers to a reciprocal exchange.

The contract in suit appears to have been drawn in the light of these principles. Paragraph 1, which defines the risk assumed, indemnifies against "loss by reason of liability for assessment," and its language cannot be construed as an undertaking to indemnify against a weakened

financial condition of International eventuating in assessment. To accomplish such a result very different language would have had to be employed.

It therefore follows that the subscribers' risk and the risk insured against, was the risk of actual assessment. The subscribers could suffer no loss, and International could be under no liability, until an assessment should be made. The making of the assessment was, in insurance parlance, the "happening of the loss."

Since the loss, i. e., the assessment, did not happen until long after the termination of the contract, the conclusion seems inescapable that no recovery thereon can be had, unless the contract contains language embodying an intent to extend its protection to a loss happening after its termination.

Appellant points to no such language. Appellant makes in substance the following argument:

Upon the acceptance of a policy a subscriber became an insurer of all other subscribers and was "immediately liable" as such insurer. Even after cancellation, says the appellant, International remained liable to all persons who had been subscribers during the period of the contract and against whom an assessment was later levied for the payment of losses which occurred while they were subscribers. The time of assessment, appellant argues, is immaterial, the only necessary condition of International's liability being the existence of losses of the Exchange during the contract period eventually requiring an assessment. In this view, International assumed a risk of indefinite duration, and the happening of a loss during the term of its contract depended not upon the establishment of the subscribers' liability to assessment, but in effect upon the pecuniary losses of the Exchange during the contract period, upon the basis of which an assessment might subsequently be made. If this construction be not adopted, says appellant, the contract in suit would be practically worthless, since International, upon

learning of any weakness in the financial condition of the Exchange, could by cancellation relieve itself of all obligation.

This argument, as above stated, is not based on the contention that the contract contains any language extending International's liability to the happening of a loss after its termination; its major premise is the assumption that the contingent liability of the subscriber to assessment created by the Act of April 9, 1929, became an actual one by reason of the financial condition of International during the existence of the contract in suit. The argument thus assumes exposure to risk to be equivalent to loss or actual liability—an assumption manifestly unsound. The subscribers' liability flows from assessment only, and it is that liability and no other against which International's contract indemnified. As above shown, Paragraph 1 of the contract clearly so provides. Moreover, Paragraph 4 does not, as suggested by appellant, lend any support to his position, since it obviously embodies a limitation, not an expansion, of International's liability and clearly contemplates that an assessment shall actually have been made before any liability can attach to International.

The argument that the contract afforded inadequate protection to the subscribers of the Exchange, because International might cancel in anticipation of insolvency, is unavailing. Apart from the fact that it ignores the three months' notice period, during which, if conditions warranted, an assessment might be made, the plain answer is that the courts cannot supply provisions to remedy deficiencies in the agreement. The parties were, in effect, two insurance companies, since the attorney-in-fact of the Exchange was itself an insurance company. Presumably their choice of the measure of protection to be afforded the subscribers was deliberate. The parties could, of course, have contracted for an extension of International's liability to the happening of an assessment after the termination of the insurance contract. Indeed, there is a circumstance which indi-

cates persuasively that such a measure of liability was considered and rejected.

Attached to appellant's original claim filed in the receivership on December 30, 1941, is a copy of a document which then purported to be the contract sued upon. This document was dated August 11, 1930, and was actually executed by International but apparently never executed by the Exchange. It was annexed to the original claim in error. To the amended claim is attached the contract in suit.

The record fails to show the circumstances surrounding the drafting and the execution by International of the document attached to the original claim. Presumably it embodied a preliminary draft of the contract finally agreed upon. Whatever it was, a comparison of the differences in the language defining the risk assumed is highly significant. The second paragraph of Article VI of the draft contract (if we may call it such) reads as follows:

"This treaty may be terminated by either party giving ninety (90) days' written notice by registered mail to the other party. The Reinsurer shall continue to participate in all business (coming within the terms of this Treaty) going into effect during said period of ninety (90) days and this Treaty shall remain in full force and effect on all policies reinsured prior to the effective date of cancellation until termination or cancellation of such policies and the liability of the Reinsurer shall extend to the final determination of the liability of the Company, even though such liability may not be determined until after the expiration or cancellation of any policy reinsured *or of cancellation of this Treaty*." (Emphasis supplied.)

The conclusion seems irresistible that the parties had under consideration a provision embodying the definition of the risk which appellant now seeks to read into the contract in suit. The seemingly deliberate omission of any such language from the contract in suit suggests an intent to limit the risk to an assessment occurring during the life of the agreement. The contract in suit is admittedly not well drawn and is in several respects ambiguous; but it is hardly to be thought that its draftsman could have supposed that a loss

happening after its cancellation would be covered in the absence of language to that effect, such as was specifically included in the document annexed to the original claim.

We find no such provision in the contract. As observed by the special master, its terms are not those of a single-premium insurance policy indemnifying the subscribers of the Exchange forever against assessment liability; on the contrary, it is one for periodic payments indemnifying against liability arising from an assessment occurring while the agreement is in force.

Appellant suggests one other point. It is said that the claim alleges losses during the term of the contract, and that the receivers by demurring to the claim admitted the existence of such losses. We find no such admission. The receivers admitted the facts set forth in the claim—essentially, the making of the assessment in 1938 and the subsequent payments by subscribers. They admitted nothing more. These facts compel the conclusions above set forth.

We are of opinion that no loss under the contract of August 11, 1930, occurred during its term, and that the claim cannot be allowed.

Since this conclusion is sufficient to sustain the Chancellor, it is unnecessary to consider the other two grounds on which he based his judgment.

The judgment of the court below is affirmed.