MOORE, Justice.
 

 In this class action the appellants are former preferred stockholders of a Delaware corporation, Shanghai Power Company (Shanghai), whose assets, and those of its wholly owned subsidiary, Western District Power Company (Western), also a Delaware corporation, were expropriated by the People’s Republic of China in 1950.
 

 Despite the rather convoluted factual and legal background of this litigation,
 
 [1]
 
 the issue before us is simple and direct: Are Shanghai and Western to be permitted to claim and hold, essentially as their own, over $1,000,000 due Shanghai’s missing preferred shareholders, or is this money to be distributed to the identifiable plaintiff class in accordance with a Stipulation and Agreement of Compromise and Settlement (the Settlement Agreement) reached earlier between the parties? The Chancellor sustained the claims of Shanghai and Western to these funds. Because virtually every reasonable effort to identify the missing stockholders has been attempted, and now exhausted, the practical effect of this ruling is to give Boise Cascade Corporation (Boise), the ultimate owner of most of Shanghai’s common stock, control and use of funds to which it is unlikely any serious claim will ever be made. In reality the money will become Boise’s.
 

 Based on this record we are satisfied that the terms of the Settlement Agreement mandate that the plaintiffs are to be the ultimate recipients of these funds. To the extent this money should be held for a further period to permit missing shareholders to appear, the statutory mechanism of 10
 
 Del.C.
 
 § 345 for the deposit of funds into court shall apply for such reasonable period as the Court of Chancery may direct.
 
 [2]
 
 Thereafter, any unclaimed funds re
 
 *1230
 
 maining shall be distributed to the properly-identified preferred shareholders of Shanghai in conformance with the terms of the Settlement Agreement. Accordingly, we reverse the judgment of the Court of Chancery and remand the matter for further proceedings consistent herewith.
 

 I.
 

 Shanghai and Western (collectively, the power companies) were incorporated in Delaware to supply electricity to Shanghai, China in the 1930’s and 1940’s. To guarantee payment of such service the power companies required a deposit of cash or securities from their customers, many of whom bought shares of Shanghai’s 6 Tael Silver Preferred Stock (the preferred stock), which they then delivered with a transfer deed to Shanghai or Western in lieu of a cash deposit. However, the shares remained registered in the buyer’s name and, absent a default, the customer continued to receive dividends on the stock. In 1950, after the Communist revolution, the new government confiscated all of the property, assets and records of Shanghai and Western. Among the items seized were the stock certificates and transfer deeds delivered as security deposits by the power companies’ customers.
 

 Although Shanghai has not been engaged in any active operations since 1950, it accrued significant assets from the settlement of World War II damage claims and for the later expropriation of its properties by the People’s Republic of China. However, in 1972 Shanghai petitioned the Court of Chancery to declare the 220,000 issued and outstanding shares of the preferred stock to be without value, and therefore, not entitled to any portion of the compensation paid on Shanghai’s various reparation claims. Ultimately, Shanghai’s motion for summary judgment to that effect was granted. This court reversed and
 
 inter alia
 
 remanded the case for a trial to determine the fair value of the preferred stock. See note 1,
 
 supra,
 
 in part,
 
 Shanghai Power Co. v. Delaware Trust Co.,
 
 Del. Ch., 316 A.2d 589 (1974).
 

 Subsequently, the Settlement Agreement was entered into by, among others, Shanghai and the plaintiff class of preferred stockholders. As approved by the Court of Chancery, the Settlement Agreement provided that a “Stock Fund” would be established by Shanghai to be allocated among the members of the class participating in the settlement. The money was to be divided pro rata among those shareholders who filed verifiable claims. The parties recognized that it would be unlikely for all holders of the 220,000 shares of the preferred stock to be found, a factor which was taken into account during the negotiations. Pursuant to the approved Settlement Agreement, and various court orders, notice of the accord was mailed to the last known addresses of the preferred stockholders. It also was published in newspapers in several countries, including one in mainland China. Moreover, a Special Master was appointed to receive and evaluate all claims seeking participation in the Stock Fund. As anticipated, many shareholders did not appear, and the owners of approximately 100,000 shares, or 45% of the preferred stock, have not submitted any claims.
 

 However, the present controversy was sparked in a rather unique way by a claim of the Shanghai Electric Power Supply Bureau (the Bureau), the agency of the People’s Republic of China now in possession of the former Shanghai and Western properties. The Bureau sought payment on 18,620 preferred shares, accompanied by the appropriate stock certificates, which the parties acknowledge were those delivered to Shanghai and Western by their customers during the 1930’s and 1940’s as security deposits for electric service. None of the transfer deeds accompanied the cer-
 
 *1231
 
 tifieates filed by the Bureau. The Special Master denied the claim, and an exception to that ruling was taken, but those issues are not before us. However, legitimate claims, respecting 1,176 of these shares, were filed by their owners, who have been paid without dispute.
 

 The issues now before us relate to the power companies’ subsequent claims to the remaining 17,444 shares which surfaced as a result of the Bureau’s earlier, but unsuccessful, claim. Shanghai and Western now assert that (1) they hold title to the shares as a result of the original deposits accompanied by the transfer documents, or (2) they have a continuing security interest in the shares which now permits them to participate in the Stock Fund. The Special Master denied these claims, reasoning that Shanghai and Western did not have title to the shares, and there being no evidence of default in payment of electric bills by any of the record owners, the latter (or their lawful successors) retained title to the stock.
 

 The power companies filed exceptions, and the Court of Chancery reversed the Special Master’s decision, concluding
 
 inter alia
 
 that Shanghai and Western were entitled to participate in the Stock Fund as the holders of a security interest in the 17,444 shares. S.A. Judah, the representative of the plaintiff class, opposed certification of the power companies’ claims, and appeals the Court of Chancery’s decision allowing them.
 

 II.
 

 Shanghai and Western first contend that they are bona fide purchasers of this stock. They reason that they acquired title to the shares for value, without notice of any adverse claim, when their customers delivered the certificates to them. However, this analysis is flawed by the power companies’ acknowledgment that they received the stock certificates solely as collateral for the payment of electric service. Unless and until a customer defaulted in payment, the shares remained registered in the stockholder’s name, and the customer continued to receive any dividends paid thereon. Under this arrangement the shareholders of record, and not the power companies, possessed valid, legal title to the stock, and the Chancellor so found.
 

 Moreover, the Settlement Agreement requires that the Stock Fund established by Shanghai be divided pro rata among the Silver Preferred Shareholders who submit verifiable claims. In defining the class who may participate in the Fund, the Agreement specifically provides:
 

 The following provisions are for the purpose of determining whether persons claiming to be members of the Class shall participate in the settlement:
 

 The Stock Participants ... consist of those persons who shall have timely filed, in accordance with paragraph 4B below, the Statement referred to in paragraph 1 above with, and proved to the satisfaction of, a special master (the “Special Master”) to be appointed by the Court that they are entitled to participate in the settlement. In reaching such determination the Special Master shall consider the Statement filed by claimants and may consider, among other things, whether (a) the claimant is in possession of certificates representing Shares ... (b) the claimant’s name appears on SPC’s lists of (i) holders of record of the Shares as of February 3, 1949 as the holder of one or more Shares . . . together with proof that he continues to hold the Shares, ... (c) if his name does not appear on said lists of holders of record of the Shares, ... such evidence as shall be presented by claimant
 
 to prove that he has acquired valid, legal title
 
 to one or more ... Shares, including the identity of his predecessors) in interest and the manner in which his predecessor’s interest(s) was transferred to claimant. The Special Master may, in determining whether an interest in Share(s) ... shall have been validly transferred to a claimant, take into consideration,
 
 inter alia,
 
 as
 
 *1232
 
 signments, gifts, testamentary and intestate dispositions and conveyances in trust.
 

 (Emphasis added).
 

 Thus, the Settlement Agreement makes clear its intent that the eligible members of the Class are only those persons who have a defined “valid, legal title” to the shares. If a claimant’s name does not appear on Shanghai’s stock lists as a holder of record, the Settlement Agreement requires proof that legal title was validly acquired. Neither of the power companies’ names appear on these lists as record owners of the 17,-444 shares produced by the Bureau, and they have no other proof of title.
 

 Alternatively, Shanghai and Western assert a security interest in these shares. The Chancellor accepted this argument, and relied on the terms of the Settlement Agreement that “[t]he Special Master’s determination of ownership shall be governed by the provisions of Article 8 of the Delaware Uniform Commercial Code and other applicable laws of the State of Delaware.” The power companies therefore reason that under Article 9 of the Delaware Uniform Commercial Code, dealing with secured transactions, they are entitled to participate in the Stock Fund, since they are holding assets, albeit of missing persons, in which a security interest now is claimed.
 

 However, we consider that position illusory at best. A security interest is defined by the Delaware Uniform Commercial Code as “an interest in personal property or fixtures which secures payment or performance of an obligation.” 6
 
 Del. C.
 
 § 1-201(37). But the former customers of Shanghai and Western can no longer be said to be indebted to either company. Indeed, in the 30 years before the stock cer-tifieates resurfaced these companies made no attempt to recover any sums due from their former customers — and they do not do so now. This is underscored by the acknowledgment of Shanghai and Western to the Court of Chancery, and to us, that they will neither claim a debt due by . any former customers, nor assert a security interest in shares deposited by them, whenever the holders appear with properly authenticated claims to this stock. Thus, we have an admission in practical effect that no debtor-creditor relationship now exists between the parties, and none will exist in the future. That being so, Shanghai and Western have no basis to assert any claim of right to the collateral.
 
 [3]
 

 III.
 

 The power companies argue that, because a debtor-creditor relationship once existed, they retain an obligation to preserve the value of the stock for their former customers even though that relationship has ended. The trial court agreed, stating that Shanghai and Western “as the holder[s] of the certificates as security on behalf of the owners of record would have the right and a duty to preserve the rights in the security on behalf of the record owners.” This result neither comports with past or existing circumstances and the express terms of the Settlement Agreement.
 

 Any present debtor-creditor relationship between the powér companies and their former customers is now disclaimed. If one existed, it was ignored for decades. Certainly, no such future relationship is even contemplated. Thus, it is rather strained to now divine a security interest with its attendant obligation.
 
 [4]
 
 In reality
 
 *1233
 
 the practical effect of allowing these claims is to make a non-stockholder, Boise, a substantial beneficiary of the Stock Fund with little or no prospect of ever parting with the money it receives. Under such circumstances equity must look to the substance of a transaction, not its form.
 
 Monroe Park v. Metropolitan Life Insurance Company,
 
 Del.Supr., 457 A.2d 734, 737 (1983). If protection is the object, then it is more properly afforded under 10
 
 Del.C.
 
 § 345, and not this illusory device.
 

 By the express terms of the Settlement Agreement, which the Chancellor approved, only those claimants possessing valid, legal title to the preferred stock may participate in the Stock Fund. They, alone, not the power companies, or their ultimate parent, Boise, meet that specification.
 

 Accordingly, the judgment of the Court of Chancery is reversed. The matter is remanded with instructions that an order be entered directing immediate repayment of the sums paid Shanghai and Western on these claims with legal interest from May 29, 1984, the date of payment to the power companies. If the Court of Chancery in its sound discretion believes that it is necessary to continue preserving the settlement value of these shares for the benefit of potential claimants, then the repaid funds and interest shall be deposited in an account pursuant to 10
 
 Del.C.
 
 § 345 for such time as may be reasonable, considering (1) the prior efforts to locate all preferred stockholders and (2) the specific intent of the Settlement Agreement. Thereafter, these funds shall be distributed to the identified Shanghai preferred shareholders in accordance with the express terms of the Settlement Agreement.
 

 REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 [1]
 

 .
 
 See Shanghai Power Company v. Delaware Trust Co.,
 
 Del.Ch., 316 A.2d 589 (1974),
 
 rev'd in part, Judah v. Delaware Trust Co.,
 
 Del.Supr., 378 A.2d 624 (1977), to which we refer for a complete description of such matters.
 

 [2]
 

 . The power of the Court of Chancery to control funds due potential claimants, even after litigation has ended, is established by 10
 
 Del.C.
 
 § 345, which provides:
 

 § 345. Power to invest moneys and take security.
 

 The Court of Chancery may, in the securing or investing of a sum or sums of money under orders of the Court, cause to be taken for the same, in any case not otherwise provided for by law, a recognizance, bond or mortgage in the name of the State, with condition for the payment of the ’money so to be secured in such manner and subject to such provisions as the Court orders, to the end that the money may be secured for the use and benefit of the person or persons who may be entitled to or interested in the same. Upon any recognizance, bond or mortgage so to be taken, a suit may be prosecuted to judgment and execution in the name of the State, but for the use of any person or persons injured by the breach of such recognizance, bond or mortgage, pursuant to the provisions of Chapter 75 of this title.
 

 A Judge of the Court of Chancery may by general or special rule or order direct that any or all moneys deposited with the Court of Chancery in connection with any action in such Court (1) be deposited in one or more interest-bearing accounts or deposits in any bank or savings institution upon such terms as shall be determined by the Court; or (2) be invested in securities of the United States of America of such duration that such money may be available when reasonably required. Any moneys so deposited may be deposited or invested with similar moneys from other actions, provided that records are maintained by the Court to identify the origin of all such moneys so received and deposited or invested.
 

 All income and interest earned on all such deposits and investments are declared to be public moneys and shall from time to time on order of a Judge of such Court be paid in equal shares to the State Treasurer and to the government of the county in which such funds are deposited with the Court or Register.
 

 The Register in Chancery in the county in which such funds are deposited or invested shall be responsible for the deposit or investment thereof as provided in this section, provided that he shall not be liable for any loss of deposit or investment not caused by his own negligence or misconduct.
 

 
 *1230
 
 Nothing contained in this section shall prevent the Court from ordering that moneys deposited in connection with any action be segregated or maintained in a special account or deposit if, in the judgment of the Court, that should be done.
 

 [3]
 

 . This clearly is different from a security interest granted in anticipation of an extension of credit. No such prospective arrangement now exists between the parties. The power companies are out of business, they will not provide any further electric service to their former customers, and they claim no past debts due from them. Thus, §§ 1-201(44) and 9-204 of the Uniform Commercial Cocle can have no applicability here.
 

 [4]
 

 . It is somewhat ironic that at the time the shares were deposited with Shanghai and Western the Uniform Commercial Code did not exist, and was not enacted in Delaware until 1967.
 
 See
 
 6
 
 Del. C.
 
 § 10-101. None of the parties contemplated any security interest under the Code,
 
 *1233
 
 and its usage in these proceedings was clearly intended to facilitate payment to title holders of the preferred stock, not to create ficticious security interests.