**S.A. JUDAH, and others similarly situated, Defendants Below, Appellants,**

v.

**SHANGHAI POWER COMPANY, Plaintiff Below, Appellee,**

and

**The United States of America, Intervenor Below, Appellee.**

Supreme Court of Delaware.

Submitted: Jan. 12, 1988.
Decided: Aug. 12, 1988.
Revised: Aug. 22, 1988.

Irving Morris (argued), Kevin Gross, and Carolyn D. Mack of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Eric W. Jorgensen and Dorothy K. Gustafson of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellants.

Richard C. Allison, Pro Hac Vice (argued), and Peter C. Williams of Reid & Priest, of counsel, New York City, R. Franklin Balotti and William J. Wade of Richards, Layton & Finger, Wilmington, Donald Mitchell, of counsel, Boise, Idaho, for plaintiff below, appellee Shanghai Power Co.

Richard Greenberg (argued) and Douglas Letter, Dept. of Justice, Washington, D.C., for intervenor below-appellee U.S., Richard Andrews, Asst. U.S. Atty., Wilmington, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and William C. Carpenter, Jr., U.S. Atty., Wilmington.

Before HORSEY, MOORE, and WALSH, JJ.

HORSEY, Justice:

This is an appeal from an opinion dated April 15, 1987, *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., 526 A.2d 906 (1987), and order dated April 29, 1987 of the Court of Chancery. The order granted the United States of America, as intervenor, summary judgment and denied summary judgment to Shanghai Power Company ("SPC")[1] on SPC's counterclaim against thirty-one Chinese entities (the "PRC Claimants") alleged to be instrumentalities of the People's Republic of China ("PRC"). The order permits the PRC Claimants to participate ratably with other preferred shareholder-claimants in the distribution of a compensation fund (the "Fund") established for the owners of the Six Tael Silver Preferred Stock (the "Preferred Stock") of SPC. The Court thereby rejected the objections of the preferred class representative, S.A. Judah, representing himself and certain other holders of the Preferred Stock (the "Class"), to the PRC Claimants' sharing in the Fund with the other Preferred Stock shareholders on an aliquot basis.

At issue is the construction of the terms of an Executive Agreement (the "Agreement" or "Executive Agreement") entered into between the United States and the PRC and the applicability of equitable principles to the terms of the Agreement. The Court of Chancery held that the Agreement must be construed as entitling the thirty-one entities, who may be presumed to be alter egos of the PRC, to participate ratably in the distribution of a portion of the Fund. The SPC has not appealed the dismissal of its counterclaim, but Class representative Judah has appealed[2] and, for the limited purposes of this appeal, SPC has joined in the Class' argument against PRC Claimants' participation in the Fund.

We find the Agreement to be clear on its face as to the parties' intentions. We also find no error of law in the Vice Chancellor's refusal to read into the Executive Agreement the Class' equitable objection to the PRC Claimants' participation in the Fund distribution. Thus, we conclude that the Executive Agreement between the United States and the PRC: (1) resolves and settles all disputes and claims arising

---

1. Prior to the commencement of this litigation, Boise Cascade Corporation acquired control over most of the common stock of SPC.

2. This is the Class' third appeal to this Court from orders and opinions of the Court of Chancery. *See Judah v. Shanghai Power Co.*, Del. Supr., 494 A.2d 1244 (1985), *rev'g Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., C.A. No. 3888, Brown, C. (Mar. 9, 1984) [available on WESTLAW, 1984 WL 14092]; *Judah v. Delaware Trust Co.*, Del. Supr., 378 A.2d 624 (1977), *rev'g in part Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., 316 A.2d 589 (1974).

out of the 1950 expropriation of American property interests by the PRC; and (2) requires that the Chinese entities (as undisputed owners of Preferred Stock) be permitted to participate, ratably, with the other preferred shareholder claimants in the distribution of the compensation Fund. Accordingly, we affirm the judgment of the Court of Chancery.

## I

The complicated fact pattern and lengthy procedural history of this case have been described several times in other opinions; however, for the purpose of this opinion, a recital of the pertinent facts may be helpful. For a more detailed description of the facts and procedural history associated with this case, see *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., C.A. No. 3888, Brown, C. (Mar. 9, 1984), *rev'd sub nom. Judah v. Shanghai Power Co.*, Del. Supr., 494 A.2d 1244 (1985); *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., 316 A.2d 589 (1974), *rev'd in part, Judah v. Delaware Trust Co.*, Del.Supr., 378 A.2d 624 (1977).

### A.

In 1929 SPC was organized under the laws of Delaware to acquire and operate a utilities system in the International Settlement of Shanghai, China. During the Sino–Japanese hostilities in 1937, the Japanese, after causing significant damage to SPC's facilities, ultimately seized the facilities and prevented their operation until the end of World War II in 1945. Thereafter, SPC resumed active operations but only for a brief time. In 1950, shortly after coming to power, the PRC expropriated most, if not all, of SPC's property, resulting in SPC's ceasing to function as a viable concern.

Although SPC has not been engaged in any active operations since 1950, it accrued significant assets from the settlement of World War II damage claims and for the claims associated with the expropriation of its properties by the PRC. The distribution of the compensation received for damages is the basis for this litigation.[3]

Following the United States' recognition of the PRC and the resumption of formal relationships between the two countries, the United States and the PRC, on May 11, 1979, entered into the Agreement, the construction of which is the centerpiece of this litigation. Under the terms of the Agreement, the PRC agreed to pay in installments to the United States government $80.5 million for the purpose of settling "the claims of the [United States government] and its nationals (including natural and juridical persons) against the PRC arising from [the 1949 nationalization and expropriation of] property of nationals of the [United States of America]." In return, the United States government agreed to accept this sum "in full and final settlement of those claims." Under a formula earlier established by the Settlement of International Claims Act, 22 U.S.C. §§ 1623–1627 (1982), SPC's share of the settlement Fund was ultimately calculated to be $20.5 million. The proper distribution of the compensation received by SPC from the 1948 settlement with the Japanese and from the 1979 settlement with the PRC has been the subject of nearly two decades of litigation in our courts.

### B.

The dispute over the distribution of the reparations began in 1972, when SPC, at

---

3. In 1964, SPC filed a claim under the War Claims Act of 1948, 50 U.S.C.App. § 2001 et seq. (1982), for damages inflicted by the Japanese during World War II. In 1967 the Foreign Claims Settlement Commission (the "FCSC") issued SPC an award of $7,808,208.12 as compensation for damages suffered at the hands of the Japanese. During this period, SPC also filed a claim with the FCSC alleging damages of approximately $54,000,000 resulting from the expropriation of SPC's property by the PRC. In 1966 Congress authorized the FCSC to evaluate the claims of the United States Nationals against the PRC. *See* Settlement of International Claims Settlement Act, 22 U.S.C. §§ 1643–1643k (1982). The FCSC subsequently valued SPC's loss at more than $143 million, the initial $54,000,000 alleged in actual loss plus accrued interest. This amount, however, was not realized by SPC. Pursuant to the terms of the Agreement, all United States claims arising out of the 1950 expropriations were settled for $80.5 million. SPC's share of this was $20.5 million.

the instigation of Boise Cascade Corporation ("Boise"), the controlling owner of most of SPC's common stock, petitioned the Court of Chancery to declare the 220,-000 issued and outstanding shares of the Preferred Stock to be without value. Boise thereby sought to secure for the SPC common shareholders (primarily itself) the entire pool of funds to be ultimately received by the SPC from its claims for reparation. The Court of Chancery granted SPC's motion for summary judgment, declaring that the Preferred Stock was without value. On appeal, this Court reversed and remanded the case for a determination of the fair value of the preferred shares. *See Shanghai Power Co. v. Delaware Trust Co.*, Del. Ch., 316 A.2d 589 (1974), *rev'd in part sub nom. Judah v. Delaware Trust Co.*, Del. Supr., 378 A.2d 624 (1977).

In 1979, SPC and the Class representative for the holders of the Preferred Stock of SPC, in anticipation of the receipt by SPC of $20.5 million from the Foreign Claims Settlement Commission (the "FCSC"), negotiated an intended compromise and settlement of the present action (the "Settlement Agreement"). Under the terms of the Settlement Agreement, SPC agreed to create a fund from a portion of its reparation recovery for division among the Class of preferred shareholders whose share ownership was verified. SPC agreed to pay into this fund for the Class: (1) $1,600,000 from the money SPC received from Japan under the War Claims Act of 1948; (2) 25% of all the monies that SPC received from the PRC for the 1950 expropriation; and (3) $1,000,000 toward the counsel fee the Class' attorneys sought as an allowance.

The Settlement Agreement required each member of the Class who sought to share in the Fund to file a Proof of Claim. At SPC's insistence, the Settlement Agreement further provided that any shareholder who should file a claim against the Fund and who was then "indebted" to SPC should be "deemed to have consented" to

the jurisdiction of the courts of Delaware in respect to the determination of SPC's claim of debt against that shareholder. The Settlement Agreement defines a "debt" to SPC to mean any claim or unsatisfied obligation "of any nature" to SPC, including any obligation that may have purported to have been released, waived or compromised by any third party, including the United States government. Thus, any shareholder claimant *deemed* to be "indebted" to SPC, "as a condition to participation in the settlement," thereby "relinquish[es] any right to rely upon any purported waiver, release or compromise made on behalf of ... SPC." [Paragraph 4F(ii) of Settlement Agreement].

By these provisions (the "consent and waiver" provisions), SPC endeavored to reactivate or restore any previously unsatisfied obligation of the PRC and to secure for itself the right to assert, by way of setoff, a counterclaim against a PRC claimant seeking to participate in the Fund distribution. Finally, the Settlement Agreement precluded the payment to any shareholder claimant of any sum from the Fund "until SPC's rights against him ... shall have been discharged by payment in full to SPC." [Settlement Agreement, paragraph 4F(i).]

In February 1980, the Court of Chancery approved the "Stipulation and Agreement of Compromise and Settlement" reached by the appearing litigants, following notice to the Class and in the absence of objections from any members of the Class. When the Chinese nationals and entities then came forward and filed claims as preferred shareholders to participate in the Fund, and SPC responded by invoking the "consent and waiver" provisions of the Settlement Agreement, the issues here presented arose.

Ultimately, thirty-one Chinese banks and other businesses located in the PRC [4] filed with a Special Master claims to 20,972 shares, worth approximately $2,000,000

---

**4.** The original number of claims filed against the PRC claimants was thirty-four, including two individual entities, each submitting two separate claims, and a claim by the Oversea–Chi-

nese Bank Corporation, Limited that subsequently satisfied Boise and the Court of Chancery of its entitlement to participate in the distribution of the Fund.

with interest.[5]  Instead of objecting to the allowance of the claims of the PRC's claimants, SPC filed "exceptions" with the Special Master.[6]  In 1980, after the Master approved, without opposition, all the claims of the PRC Claimants, SPC invoked its right under the terms of the Settlement Agreement and filed a counterclaim against the PRC Claimants.  The counterclaims were for SPC's "unrecovered" certified losses resulting from the PRC's 1950 expropriation of its assets (the difference between the $53.8 million of actual losses certified by the FCSC to have been sustained by SPC and the $20.5 million of reparations allocated to SPC under the Executive Agreement).[7]  By its counterclaims, SPC asserted that each of the thirty-one Chinese banks and businesses was simply an "alter ego" of the PRC.  SPC then sought against each of the PRC Claimants a judgment for SPC's unrecovered reparation losses attributable to the PRC by way of offset against their several claims for participation in the Fund.  When the

PRC Claimants failed to appear and respond to SPC's counterclaims or to its discovery requests, SPC secured from the Court of Chancery default judgments upon its counterclaims against the PRC Claimants.

In the meantime, the Chinese government, well before entry of the default judgments against the PRC Claimants, protested through diplomatic channels to the Department of State SPC's assertion of counterclaims against the PRC Claimants.  The PRC contended that SPC's counterclaims were in violation of the Executive Agreement between the United States and the PRC.  Following the Court's grant of default judgments in favor of SPC upon its counterclaims, the PRC in April 1983 again sent a telegram of protest to the United States government.[8]  The PRC stated that unless the United States government intervened in favor of the PRC Claimants, the PRC "will have no choice but to take measures deemed necessary." [9]

5.  As anticipated, many shareholders did not appear, and the owners of approximately 100,000 shares, or 45% of the Preferred Stock, did not submit any claim.

6.  The PRC Claimants filing their claims created a problem for SPC.  Although the basis for any SPC counterclaim against the PRC Claimants had to rest upon the assertion that the PRC Claimants were alter egos of the PRC, were SPC to oppose the PRC Claimants on that ground, objecting to their participation in the Fund, and the Special Master to reject the PRC Claimants' claims, SPC would no longer have the PRC Claimants' share of the money in the Fund as a source of payment of its counterclaims against the PRC Claimants.

7.  SPC also filed suit in the United States Court of Claims against the United States contesting the Executive Agreement on constitutional grounds.  SPC contended that the Government's settlement of SPC's expropriation claim for an amount less than SPC's opinion of the value of its claim constituted an unlawful taking of property without just compensation, in violation of the Fifth Amendment.  The claim was rejected in *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237 (1983), *aff'd mem.,* Fed.Cir., 765 F.2d 159, *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).  As will be seen, the Court of Chancery relied heavily (and properly so) upon the outcome of this federal parallel litigation, not only in setting aside SPC's default judgments entered against the PRC claimants, but also in ultimately concluding that the Exec-

utive Agreement represents "the supreme law of the land" and "unequivocally binds both this Court and Shanghai Power" by representing a full and final settlement of SPC's expropriation claim.  *Shanghai Power Co. v. Delaware Trust Co.,* 526 A.2d at 911.

8.  The PRC protest stated, in part:

According to the May 11, 1979 Sino–American Agreement concerning the settlement of claims, the questions between the United States and China regarding assets have been completely and finally resolved;  (therefore) the American side should not put forward to the Chinese side any requests concerning claims.  For this reason, it is absolutely impossible for the American–Shanghai Power Company to raise any question concerning a counterclaim against the Chinese side....

The Sino–American Agreement for settling claims is a governmental agreement which deserves serious treatment.  The Chinese Ministry of Foreign Affairs once again requests the U.S. government to urge the U.S. authority concerned to strictly abide by and execute the above-mentioned agreement.

9.  The PRC's communication concluded:

If the U.S. Government refers to the independence of the Judiciary as an excuse, sheds its responsibility to carry out the agreement, and refuses to carry out the bilateral governmental agreement for settling claims, the Chinese side will have no choice but to take measures deemed necessary, and the consequences aris-

The United States then moved, albeit tardily, to intervene, and in March 1984, the Court granted the government leave to intervene. Intervention was granted on the basis of the United States' interest, the international implications of the case, and the recently-issued decision of the U.S. Court of Claims in *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237 (1983), *aff'd mem.,* Fed.Cir., 765 F.2d 159, *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). Simultaneously, the Court set aside the default judgments obtained by SPC against the thirty-one Chinese banks and business entities.[10]

Following cross-motions for summary judgment on SPC's counterclaims, the Court of Chancery ruled in favor of the United States. The Court ruled that the Executive Agreement extinguished the SPC's unrecovered reparations claims against the PRC; hence, the SPC's counterclaims were based on nonexistent debts. The Court found that the Agreement did not bar the PRC Claimants (even assuming them to be alter egos of the PRC) from sharing in the Fund set aside for SPC's preferred shareholders, and that the Settlement Agreement was in inherent conflict with, and overridden by, the Agreement and, hence, unenforceable. Finally, the Court concluded that the SPC was without authority to condition the PRC Claimants' right to participate in the Fund distribution upon an implied waiver by them of their benefits conferred by the Agreement.

This appeal is taken solely by the class representative, not by the SPC. Hence, the issues on appeal are limited to those raised below by the class representative.

## II

The Class raises two issues on appeal: (i) whether the terms of the Agreement, ei-

ther directly or indirectly, exclude the PRC Claimants from participating in the SPC settlement proceedings equally with other claimants; and (ii) whether principles of equity under Delaware law apply and foreclose the PRC from sharing ratably in the distribution of the Fund with the injured members of the Class. The Class contends that the Agreement itself excludes the PRC Claimants from participating in the distribution of the Fund and, even if such exclusion is not found in the Agreement, the equitable principle of "unclean hands" under Delaware law will preclude the PRC Claimants from recovering a portion of the Fund, created to benefit members of the Class who were injured as the result of the PRC's actions.

## A.

■ The Class' effort to exclude the PRC entities from the benefits of the Agreement concededly finds no support in the bilateral and sweeping terms of the Agreement reached by the sovereign governments of the two countries. The claims settled under the terms of the Agreement are:

(a) the claims of the USA and its nationals (including natural and juridical persons) against the PRC arising from any nationalization, expropriation, intervention, and other taking of, or special measures directed against, property of nationals of the USA on or after October 1, 1949 and prior to the date of this Agreement; and

(b) the claims of the PRC, its nationals, and natural and juridical persons subject to its jurisdiction or control against the USA arising from actions related to the blocking of assets by the Government of the USA on or after De-

ing therefrom will be totally the responsibility of the American side.

**10.** In an unreported letter opinion dated March 9, 1984, then Chancellor Grover C. Brown expressed his concern for "the international ramifications" of the case and "the potential for a substantial international problem between this country and the Peoples' Republic of China ("the PRC") if the judgment stands as entered." The Court also noted that "SPC caused the terms

of the settlement [of the litigation] to be structured ... to get around the terms of the Executive Agreement to the extent that the Agreement purported to extinguish SPC's claims against the PRC in return for the amount recovered on SPC's behalf by the United States under its terms." *Shanghai Power Co. v. Delaware Trust Co.,* Del.Ch., C.A. No. 3888, slip op. at 2, Brown, C. (March 9, 1984).

cember 17, 1950 and prior to the date of this Agreement.

People's Republic of China Settlement of Claims Agreement, May 11, 1979, United States–People's Republic of China, 30 U.S. T. 1957, T.I.A.S. No. 9036. The Agreement expressly provides that all claims of the United States and its nationals are settled through the terms of the Agreement. The term "nationals" is broadly defined to include "natural and juridical persons" of each country, encompassing all business organizations and corporations. The Agreement contains no exceptions or limitations upon the meaning of the term "juridical persons." The language of the Agreement does not brook discrimination against business or corporate claimants of the PRC (or of the United States) who establish preferred shareholder ownership interests in SPC.

Therefore, we must reject the Class' effort to read into the Agreement's inclusive terms "nationals" and "juridical persons" a mutual intent by both governments to exclude corporate or business entities located within the Peoples Republic of China. To do so would involve the Court in rewriting the Agreement, an act contrary to the practice of this Court.[11] *See, e.g., Conner v. Phoenix Steel Corp.,* Del.Supr., 249 A.2d 866 (1969) (a court may not, in guise of construing a contract, in effect rewrite it to supply omission in its provisions); *In Re Int'l Re–Ins. Corp.,* Del.Supr., 86 A.2d 647 (1952) (courts cannot supply provisions to remedy deficiencies in agreement between the parties as drawn).[12]

Moreover, the Class' argument to exclude the PRC entities, though verified shareholders of SPC, from sharing in the Fund runs counter to a fundamental purpose of treaty undertakings. One of the major goals in the restoration of relationships between previously hostile sovereign

powers is the elimination of "outstanding claims by nationals of one country against the government of another country [which are] 'sources of friction' between the two sovereigns." *Dames & Moore v. Regan,* 453 U.S. 654, 679, 101 S.Ct. 2972, 2986, 69 L.Ed.2d 918, 939 (1981) (citing *United States v. Pink,* 315 U.S. 203, 225, 62 S.Ct. 552, 563, 86 L.Ed. 796, 814–15 (1942)). The Vice Chancellor correctly found:

> The policy underlying the settlement of American claims against the PRC was to remove these very real sources of friction. Indeed, the Court of Claims noted that 'settlement of outstanding claims against the PRC was a *sine qua non* of normalized relations between the two countries.' *Shanghai Power Co. v. United States,* 4 Cl.Ct. at 245. Enforcement of Shanghai Power's counterclaim would revive a source of friction carefully laid to rest and, thus, would undermine the policy behind the Executive Agreement.

526 A.2d at 913. Clearly, the Class' construction of the Agreement, as disqualifying a class of nationals of one of the country signatories from sharing in the Fund recovery, would undo the purpose of repose underlying a treaty document. In fact, as noted above, the SPC's efforts to deny the PRC Claimants' claims has already rekindled friction between the two sovereign powers, *see supra* notes 8 and 9, and caused the PRC in 1985 to withhold $2 million from its installment payments under the Agreement.

To rule as the Class suggests would require the PRC business entities to forfeit their property interests in the United States. As the Vice Chancellor stated: "The Executive Agreement describes the rights the PRC gave up and that description does not include its rights, or those of

---

**11.** A treaty is to be construed on principles similar to those applied to other written contracts. *See, e.g., Sullivan v. Kidd,* 254 U.S. 433, 41 S.Ct. 158, 65 L.Ed. 344 (1921); *United States v. Reynes,* 50 U.S. (9 How.) 127, 13 L.Ed. 74 (1850).

**12.** Moreover, it is well established that this interpretation by the United States is entitled to

great weight when determining the terms of the Agreement. *See, e.g., Kolovrat v. Oregon,* 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961); *Argento v. Horn,* 6th Cir., 241 F.2d 258, *cert. denied,* 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35, *reh'g denied,* 355 U.S. 885, 78 S.Ct. 145, 2 L.Ed. 2d 115 (1957).

any of its entities, as a stockholder in an American company." 526 A.2d at 914. Further, as the United States points out, one of the explicit purposes of the Agreement was the "unblocking" of Chinese assets frozen in this country in order to permit the PRC and its nationals to seek to recover such assets. To exclude the PRC entities—on little more than political grounds—from realizing on their ownership interests in SPC would be inconsistent with the "unblocking" provisions of the Agreement and, as noted, would amount to confiscation of the property interests of PRC entities in this country. For our courts to invoke such result would be an impermissible interference in the formulation and the settlement of a treaty obligation which is considered the supreme law of the land and binding on all courts, federal and state. "Claims [under an Executive Agreement] having been settled, they are no longer cognizable in the courts, except insofar as permitted by the settlement's terms." *Chas. T. Main Int'l Inc. v. Khuzestan Water & Power Authority*, 1st Cir., 651 F.2d 800, 814 (1981); *see also Asociacion de Reclamantes v. United Mexican States*, D.C.Cir., 735 F.2d 1517 (1984), *cert. denied*, 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985).

### B.

■ The Class' remaining, if not principal, ground for exclusion of the PRC entities from the Agreement's benefits is that the Court of Chancery erred in failing to find the equitable maxim of "clean hands" to bar PRC Claimants.[13] The argument hinges on the Class' finding within Article Four of the Agreement a relinquishment by the United States government of its sovereignty over treaties to a state court system to apply local legal precepts in disposing of claims asserted under this Agree-

ment. The argument also assumes that the PRC (and its alter ego entities) should in the construction of the Agreement be portrayed as the "wrongdoers" who will otherwise be compensated. The Class would thereby not accord to the Agreement the effect of a treaty as a final settlement of disputes between sovereign powers. Implicit in this argument is the unstated assumption that the Executive Agreement is intended to divest PRC Claimants of their ownership rights in American property represented by their shares of SPC Preferred Stock.

The short answer to the argument is the Class' unsupported premise that Article Four is an invitation to a state court to apply to a treaty obligation local state precepts. The Class reads too much into the Article. Article Four provides: "The Government of the USA shall be exclusively responsible for the distribution of all proceeds received by it under this Agreement." People's Republic of China Settlement of Claims Agreement, May 11, 1979, United States–People's Republic of China, 30 U.S.T. 1957, T.I.A.S. No. 9036. We find Article Four to be purely ministerial in nature and not to confer judicatory powers upon state courts, as the Class argues. We construe Article Four as no more than a delegation by the PRC to the United States of responsibility for distribution of the proceeds. We find no basis for construing the concise and plain language of Article Four as a relinquishment by the federal government to the states of authority to adjudicate rights under the Agreement. To adopt the interpretation of the Class would expand Article Four beyond its plain meaning and purpose, resulting in this Court's: (i) rewriting the Agreement; (ii) redefining its beneficiaries by discriminating against certain shareholders on grounds of political association and imput-

---

**13.** The Class contends that even if the PRC Claimants are not excluded from participating in the Fund by the Agreement, the equitable principle of "unclean hands" under Delaware law will prohibit the PRC Claimants from participating in the Fund. The Class argues that "[o]ne of the most fundamental precepts of invoking equitable jurisdiction is that one must approach a court of equity with clean hands."

The Class and the PRC assert that "the purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit." *Skoglund v. Ormond Indus., Inc.*, Del.Ch., 372 A.2d 204, 213 (1976); *see also Electrical Research Products Inc. v. Vitaphone Corp.*, Del.Supr., 171 A. 738, 753 (1934).

ed wrongs; and (iii) disregarding the intent of the parties responsible for the drafting of the provision.

Moreover, as already noted, the Executive Branch of this government, properly within its power, negotiated the terms of the Agreement with the PRC, and this Court cannot question those terms. *See United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936); *Chas. T. Main Int'l Inc. v. Khuzestan Water & Power Auth.*, 1st Cir., 651 F.2d 800, 811–12 (1981). Equitable principles are no exception. To apply a "clean hands" principle to foreclose the PRC Claimants from participating in the Fund presupposes wrongdoing by the PRC. *Cf. Skoglund*, 372 A.2d at 213; *Electrical Research*, 171 A. at 753. To find such wrongdoing would be in direct conflict with the purpose and intent of the Agreement. The Agreement extinguishes all underlying claims by altering the substantive law to preclude recognition of such claims. In entering into an international claims settlement, "[t]he President has exercised the power, acquiesced in by Congress, to settle claims and, as such, has simply effected a change in the substantive law governing the lawsuit." *Dames & Moore v. Regan*, 453 U.S. at 685, 101 S.Ct. at 2989, 69 L.Ed.2d at 943 (1981). State policies incorporating equitable principles which would thwart changes in the foreign policy are invalid invasions of federal authority under the Supremacy Clause. *See Pink*, 315 U.S. at 232–33, 62 S.Ct. at 566–67, 86 L.Ed. at 818–19. As stated by the United States Supreme Court:

> [S]tate law must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or an international compact or agreement. Then, the power of a State to refuse enforcement of

rights based on foreign law which runs counter to the public policy of the forum must give way before the superior Federal policy evidenced by a treaty or international compact or agreement.

*Id.* at 230–31, 62 S.Ct. at 566, 86 L.Ed. at 818 (citations omitted).

Thus, this Court cannot apply equitable principles to foreclose the PRC from sharing in the Fund. To do so would be the equivalent of allowing counterclaims against the PRC, actions that are now conceded to be expressly prohibited under the terms of the Agreement. Principles of equity under Delaware law must yield when they are inconsistent with or impair the policy or provisions of the Agreement. *See id.* The policy underlying the Agreement is the settlement of all claims arising out of the 1950 expropriation of SPC by the PRC and the subsequent blocking of PRC assets by the United States. With the settlement of all claims being expressly provided for in the Agreement, equitable principles cannot impair this policy by precluding the PRC Claimants from participating in the Fund.

\* \* \*

The Agreement must be construed as allowing the PRC claimants to participate on an equal basis with other verified preferred shareholder claimants in the distribution of the Fund set aside for the preferred shareholders of SPC stock. Accordingly, the judgment of the Court of Chancery is affirmed.